**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

AARON FILLMORE, #B63343,      )
                              )
                              )
     Plaintiff,               )
                              )
                              ) Case No. 22-2705-GCS
                              )
vs.                           )
                              )
                              )
ROB JEFFREYS, et al.,         )
                              )
                              )
     Defendants.              )

VIDEOCONFERENCE DEPOSITION OF AARON FILLMORE

Taken on behalf of the Defendants

March 26th, 2024

10:01 a.m. to 1:28 p.m.

Jamie Jo Kinder, CCR 842, CSR 084.003306

---

**Page 2**

```
1              I N D E X
2                              Page
3            EXAMINATION
4  QUESTIONS BY MS. MATUSOFSKY         5
5  QUESTIONS BY MS. POWELL            82
6  QUESTIONS BY MS. MATUSOFSKY       106
7  QUESTIONS BY MS. POWELL           111
8
9
10 (No exhibits marked.)
11
12 (The material quoted in the transcript was written verbatim
13 as read, and may not be a direct quote from the exhibit.)
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF ILLINOIS
2
3
   AARON FILLMORE, #B63343,      )
4                                )
     Plaintiff,                  )
5                                ) Case No. 22-2705-GCS
   vs.                           )
6                                )
   ROB JEFFREYS, et al.,         )
7                                )
     Defendants.                 )
8
9              VIDEOCONFERENCE DEPOSITION OF WITNESS, AARON
10 FILLMORE, produced, sworn, and examined on the 26th day of
11 March, 2024, between the hours of 8:00 o'clock in the
12 forenoon and 5:00 o'clock in the afternoon of that day with
13 all parties attending remotely via Zoom before Jamie Jo
14 Kinder, Missouri CCR 842, Illinois CSR 084-003306, a
15 Certified Shorthand Reporter within and for the State of
16 Illinois, in a certain cause now pending before the United
17 States District Court for the Southern District of
18 Illinois, wherein AARON FILLMORE, #B63343, is the
19 Plaintiff, and ROB JEFFREYS, et al., are the Defendants.
20
21
22
23
24
25
```

---

**Page 4**

```
1              A P P E A R A N C E S
2  The Plaintiff was pro se
3
4  For the Defendant Jeffreys:
5       Ms. Jennifer Powell
          ASSISTANT ATTORNEY GENERAL'S OFFICE
6         201 West Pointe Drive, Suite 7
          Belleville, IL  62226
7         (618) 236-8784
          jennifer.powell@ilag.gov
8
9  For the Defendant Myers and Wise:
10      Ms. Alison Matusofsky
          CASSIDAY SCHADE, LLP
11        100 North Broadway, Suite 1580
          St. Louis, MO  63102
12        (314) 241-1377
          amatusofsky@cassiday.com
13
14
15
16
17
18 The Court Reporter:
19 Ms. Jamie Jo Kinder, CCR, CSR
   LEXITAS LEGAL
20 711 North Eleventh Street
   St. Louis, MO  63101
21 (800) 280-3376
   https://lexitaslegal.com
22 stl.customerservice@lexitaslegal.com
23
24
25
```

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                    California Firm Registration #179

LEXITAS

Page 5

1    (Deposition commenced at 10:00 a.m.)
2         IT IS HEREBY STIPULATED AND AGREED, by and
3    between counsel for Plaintiff and counsel for Defendants,
4    that the videoconference deposition of AARON FILLMORE may
5    be taken in shorthand by Jamie Jo Kinder, CCR, CSR, a
6    notary public and shorthand reporter, and afterwards
7    transcribed into typewriting; and the signature of the
8    witness is expressly reserved.
9              * * * * *
10             AARON FILLMORE,
11   of lawful age, being produced, sworn and examined on
12   behalf of the Defendants, deposes and says:
13             EXAMINATION
14   QUESTIONS BY MS. MATUSOFSKY:
15        Q    Can you please state your full name for the
16   record?
17        A    Aaron Paul Fillmore.
18        Q    And can you spell your last name?
19        A    F-I-L-L-M-O-R-E.
20        Q    Thank you.  Where are you testifying from
21   today?
22        A    Northeast Correctional Facility in New Mexico.
23        Q    So my name is Alison Matusofsky, and I
24   represent Dr. Percy Myers and Nurse Practitioner Melissa
25   Wise in this case.

Page 6

1    Have you ever had your deposition taken
2    before?
3         A    Many times.
4         Q    About how many times?
5         A    I think this is the fifth one.
6         Q    And were all of those depositions related to
7    your time since you've been incarcerated?
8         A    Yes.
9         Q    So you understand generally the rules, but I'm
10   going to go over them again.  Do you understand that you're
11   under oath today?
12        A    Yes.
13        Q    This is a question/answer format.  I'm going
14   to ask you some questions.  Ms. Powell is going to ask you
15   some questions.  We're going to need you to answer those
16   questions.  You've been doing a good job so far, but please
17   try to let me finish asking my question before you begin
18   your answer, and I'll do my best to let you finish your
19   answer before I start my next question.  Does that sound
20   fair?
21        A    Yeah.
22        Q    We're all appearing here by video today, so it
23   might be a little bit difficult for us to hear each other
24   and for the court reporter, Ms. Kinder here, to hear
25   everything that we're saying.  So please try to wait for

Page 7

1    whomever is talking to finish talking.  Also, if I ask you
2    to repeat yourself, it's likely that I didn't hear your
3    response or there was some sort of video conferencing lag.
4    If you need me to repeat myself, just ask and I'll repeat
5    my question.  Okay?
6         A    Okay.
7         Q    You've been doing a great job so far.  If you
8    could keep it to verbal answers, yes, no, rather than
9    uh-huh and huh-uh, shaking your head.  It's natural, but
10   I'll ask you, what does that mean?  If you don't understand
11   a question, please let me know and I'll rephrase it.  If
12   you answer my question today, can I assume that you
13   understood it and answered it truthfully?
14        A    Yes.
15        Q    And we can take a break at any time, but if I
16   have a question pending, I just ask that you answer that
17   question before we take a break.  Okay?
18        A    All right.
19        Q    Okay.  Let's get started.  What is your date
20   of birth?
21        A    1/10/75.
22        Q    And where were you born?
23        A    DeKalb, Illinois.
24        Q    Where was that again?
25        A    DeKalb.

Page 8

1         Q    Okay.  Is that where you grew up?
2         A    No.  I grew up in Aurora.
3         Q    In Illinois?
4         A    Yeah.
5         Q    Have you ever gone by any other names besides
6    Aaron Filmore?
7         A    No.
8         Q    You included your marital status in the
9    information about your minor child in your answers to the
10   interrogatories.  Is that information still correct and
11   current?
12        A    The marital status isn't.  I'm married now.
13        Q    And what's the -- What's your wife's name?
14        A    Naomi.
15        Q    Is her last name Fillmore?
16        A    Yes.
17        Q    And where does your wife live?
18        A    Arizona.
19        Q    Can you spell Naomi?  I know there's a lot of
20   ways to spell that.
21        A    N-A-O-M-I.
22        Q    That's the way I guessed, but I wanted to make
23   sure.  I know people put an extra I in there or --
24        A    So am I going to be deposed by the Wexford
25   defendants and the AAG?  I just thought it was the AAG

March 26, 2024

Page 9

1  today.

2      Q    It's both of us.  She was just the one that

3  sent the notice.

4      A    Because I wasn't given notice of -- to Wise

5  and Myers, you guys doing the deposition, so that's why I

6  was -- I'm -- I could proceed as best I can, though.

7      Q    Okay.  Typically, we don't both send notices.

8  It's just one -- one side sends the notice.  So she was the

9  one that arranged it.  But typically, we don't both send

10  notices for that.  I think it's typically assumed that

11  you're only deposed once, so we depose you both together.

12  But if at any point you have any questions or need to see

13  something, just let me know.  Okay?

14      A    All right.

15      Q    And I think I'll be able to share my screen

16  and show you some documents, too, while we're talking.  So

17  if anything comes up and you need to look at something,

18  just let me know.  Okay?

19      A    All right.

20      Q    Are you still in -- under the custody of the

21  Illinois Department of Corrections?

22      A    Yes.

23      Q    Okay.  And what is your IDOC inmate number?

24      A    B63343.

25      Q    And what are the circumstances?  I know that

Page 10

1  you're at a New Mexico prison currently, but what are the

2  circumstances of your transfer to New Mexico?

3      A    I have no idea.

4      Q    Okay.  Do you have any idea how long you'll be

5  there?

6      A    I have no idea.

7      Q    Okay.  And do you have a New Mexico inmate

8  number?

9      A    Yes.

10      Q    And what is that?

11      A    90259.

12      Q    You were first incarcerated with the Illinois

13  Department of Corrections in what year?

14      A    '92 in juvenile, or '91.

15      Q    Okay.  But for this current sentence?

16      A    1994.

17      Q    Okay.  And what were the charges?

18      A    Murder and aggravated discharge of a firearm.

19      Q    And did you plead guilty to those charges?

20      A    No.

21      Q    Can you please detail which IDOC facilities

22  you were at from 2015 to present, if you can remember, in

23  chronological order?

24      A    I was in Lawrence Correctional Center from

25  2013 to 2020 and then transferred to Pontiac Correctional

Page 11

1  Center until 2022 of March, back to Lawrence Correctional

2  Center.

3      Q    And then you were transferred to New Mexico?

4      A    I was transferred to -- I think it's called

5  RDC [sic] in Stateville, and then -- for a few hours, and

6  then they transferred me to New Mexico.

7      Q    Is that NRC?

8      A    Yeah.  NRC.

9      Q    Do you remember when you were at NRC?

10      A    January 23rd.

11      Q    Of 2023?

12      A    Yeah.

13      Q    Okay.  And then you went to New Mexico after

14  that?

15      A    Yeah.  The next day.

16      Q    Have you ever been convicted of a felony

17  anywhere besides the state of Illinois?

18      A    No.

19      Q    Have you ever been convicted of a crime

20  involving fraud or dishonesty?

21      A    No.

22      Q    Have you ever been convicted of perjury?

23      A    No.

24      Q    Do you have any medical conditions or are you

25  on any medications that would prevent you from

Page 12

1  understanding my questions today?

2      A    No.

3      Q    Are you on any medications that would affect

4  your ability to recall certain events or respond truthfully

5  to my questions today?

6      A    No.

7      Q    Are you currently taking any medications?

8      A    Yeah.  For my carpal tunnel syndrome.

9      Q    What are you taking?

10      A    Mobic and erythro -- acetaminophen.

11      Q    Acetaminophen?

12      A    Yeah.

13      Q    Tylenol?

14      A    Yeah.

15      Q    And have you taken those medications as

16  prescribed in the last 24 hours?

17      A    No.

18      Q    So you haven't taken them, or you've taken

19  them --

20      A    I haven't taken them today yet, no.

21      Q    Okay.  And if there's med line during this

22  deposition, just let us know and we can take a break and

23  you can go get your medications.  Okay?

24      A    All right.  That shouldn't be an issue.

25      Q    And the same with food, if they say it's



Page 13

1  lunchtime --

2    **A    It shouldn't be an issue.**

3    Q    -- we can take a break for that as well.

4  Okay.  And so in your answers to the Wexford defendants'

5  interrogatories, you listed your job history before your

6  incarceration; is that correct, to the best of your

7  knowledge?

8    **A    There are -- these are your interrogatories**

9  **that you served on; right?**

10    Q    Correct.  I can pull those up if you need

11  them.

12    **A    I think I have them right here.  What**

13  **question -- What number of question are you referring to?**

14    Q    No. 14.

15    **A    I would add that I was in Guadalupe County**

16  **Correctional Facility in Santa Rosa.  I was a painter for**

17  **maintenance probably November, December of last year.**

18    Q    For how long?

19    **A    Just those two months right there, and I**

20  **was -- I'm a shower porter now at Northeast Correctional**

21  **Center here in Clayton.**

22    Q    And what is a shower porter?  What does that

23  job entail?

24    **A    Just sweep and clean and scrub the shower,**

25  **make sure they're clean.**

Page 14

1    Q    And how often do you do that job?

2    **A    Every day.**

3    Q    And what are your wages at that job?

4    **A    Fifty cents an hour.**

5    Q    And then looking at that response, it says

6  that you were a wing porter at Lawrence Correctional Center

7  from 2022 until 2023; is that right?

8    **A    Yeah.**

9    Q    How many months were you a porter, if you can

10  remember, at Lawrence?  Or what particular time frame, if

11  you can recall?

12    **A    It was probably a couple of months.  I'm**

13  **questioning.**

14    Q    Sometime fall/winter of '22 into spring of

15  '23?

16    **A    It was probably maybe November, December 2023,**

17  **and first part of January when I was transferred to New**

18  **Mexico.**

19    Q    Okay.  Sorry.  Let me just clarify.  So it

20  would have been November or December of '22 --

21    **A    Yeah.**

22    Q    -- into January of '23?

23    **A    Yeah.**

24    Q    Okay.  And what kind of -- Besides passing the

25  phone, sweeping and mopping, were there any other duties

Page 15

1  that you did as a wing porter?

2    **A    No.**

3    Q    And what were your wages doing that, if you

4  remember?

5    **A    I have no idea.**

6    Q    Okay.

7    **A    Pennies.**

8    Q    Did you have any jobs while you were at

9  Pontiac?

10    **A    No.  I was in solitary.**

11    Q    Besides the lawsuit that we're here to talk

12  about today, have you ever filed a lawsuit before?

13    **A    Yes.**

14    Q    My review of the court docket shows that you

15  filed several lawsuits in Sangamon County in Illinois; is

16  that correct?

17    **A    Probably.**

18    Q    To your recollection, were any of these cases

19  involving cuffing or cuffing permits?

20    **A    No.**

21    Q    What about for medical treatment to your right

22  shoulder or left wrist and arm?

23    **A    No.**

24    Q    And then I saw a case that it looks like you

25  filed in around 1997 called Fillmore versus Page.

Page 16

1    **A    Yeah.**

2    Q    What was that case about, generally?

3    **A    Excessive force from Menard.  They beat and**

4  **tortured me, the officers.**

5    Q    And what was the outcome of that case?

6    **A    A couple of trials, and we lost.**

7    Q    So you didn't receive any payment for that

8  case?

9    **A    No.**

10    Q    And then I also saw that there were several

11  suits that you filed along with some other individuals in

12  custody, one that's called Davis versus Baldwin; is that

13  correct?

14    **A    Yes.**

15    Q    What is that case about?

16    **A    Long-term isolation and long-term segregation,**

17  **administrative detention in Illinois, about now due process**

18  **and the typical hardship of IDOC officials housing**

19  **individuals in solitary without due process for years and**

20  **years on end.**

21    Q    And is that case still open?

22    **A    Yes.**

23    Q    So you haven't received any payment for that

24  case?

25    **A    There is no -- there is no payment requested**



Page 17

1   in that case.  It's just injunction and compensatory.

2       Q   And then there's also Coleman versus Taylor.

3   Do you recall being a part of that up in the Northern

4   District?

5       A   That's the same as Davis versus Baldwin.

6       Q   Okay.  So it's the same -- arising from the

7   same incident and same facts?

8       A   Yeah.  It was just transferred to Southern

9   Illinois.

10      Q   Gotcha.  Okay.  Are there any other civil

11  suits besides what we already discussed and the one that

12  we're here to talk about today?

13      A   Pending?

14      Q   Just generally.  I know we talked about the

15  Sangamon County ones and then those three other cases.  Are

16  there any others that you have that are either pending or

17  closed?

18      A   There's a lot that's closed, but you'd have to

19  look at the IDOC litigation, their file.

20      Q   But besides this one and the Davis one, do you

21  have any other pending cases?

22      A   No.

23      Q   While you were at Lawrence Correctional

24  Center, were you in segregation at any point?

25      A   I was in segregation the entire time there,

Page 18

1   all of those years.

2       Q   You cut out at the beginning.  What did you

3   say at the beginning of that?

4       A   I was in segregation my entire stay at

5   Lawrence from 2013 to '20 and then from '22 to '23.  And

6   either administrative detention or segregation, it's the

7   same thing.

8       Q   And was that the same at Pontiac as well?

9       A   Yep.

10      Q   And are you aware of why you are on

11  administrative detention?

12      A   No.  They don't tell you.

13      Q   What about segregation, are you aware of why

14  you were on segregation?

15      A   Yeah.

16      Q   And why?

17      A   For a disciplinary infraction that was

18  expunged after I did my segregation time.

19      Q   And what disciplinary infraction was that?

20      A   I can't remember the exact charge.  Something

21  dealing with security threat group.

22      Q   So security threat group, is that also -- is

23  another word for that is gang?

24      A   It used to be, yeah.

25      Q   Before you were incarcerated with the IDOC,

Page 19

1   did you have a physician that you saw on a regular basis?

2       A   Dr. John LaCart from Aurora, Illinois.

3       Q   Can you spell that last name, if you know?

4       A   I think it's cap L, small A, cap C, A-R-T.

5       Q   You said that's in Aurora?

6       A   Yeah.

7       Q   And when was the last time you saw Dr. LaCart,

8   if you can remember?

9       A   Sometime in the early '90s.

10      Q   And did you have a history of any right

11  shoulder injuries at that point?

12      A   No, not then.

13      Q   And then what about left wrist injury, did you

14  have a history of that?

15      A   Yeah.  From 1982 until present.

16      Q   And can you describe the injury that you had?

17      A   I was seven years old, I fell out of a tree

18  and I had a compound fracture to my left wrist where the

19  growth plate was removed.  And then pins were put in and

20  then removed after multiple surgeries, and I only have,

21  like, limited movement to that wrist.

22      Q   Have you seen your IDOC medical records?

23      A   I only have seen what you and the AAG has

24  produced.  I haven't -- I have requested through Lawrence

25  Medical for all of my records, but they have failed to

Page 20

1   produce anything or even respond to my request.

2       Q   And when did you request those records?

3       A   Before being transferred to New Mexico and

4   once while I was here.

5       Q   Okay.  So sometime in 2022 and then since --

6   when was the last time -- When you were in New Mexico, when

7   did you request them?

8       A   Maybe January or February of 2023.

9       Q   Okay.  Can you recall all of your medical

10  treatment off the top of your head, or do you have to look

11  at the medical records to refresh your memory?

12      A   Describe medical treatment.  What do you mean?

13      Q   All the visits that you have had with the

14  doctor, nurses, nurse practitioners, or do you need to look

15  at the medical chart to kind of refresh your memory?

16      A   For the past 30 years?  Yeah.  I'd have to

17  look at something.

18      Q   Okay.  Do you generally agree that the medical

19  records are accurate in what they say about your treatment?

20      A   I don't know without seeing them or reviewing

21  them.  I would agree that the ones dealing with my medical

22  permits and my front cuff and my waist chain permits are

23  accurate.

24      Q   Have you talked with anybody about this case

25  besides us talking right now and maybe somebody about



Page 21

1  filing something for you in the prison?  Have you talked to
2  anybody about the allegations that you've brought in this
3  case?
4      A   Yeah.  Law firms and attorneys and prisoners.
5      Q   Okay.  So I don't want to talk to you about
6  any communications you've had with any law firms or
7  attorneys.  But just to clarify, you're not currently
8  represented by an attorney at this time; is that correct?
9      A   That's right.
10     Q   So then you also spoke with inmates.  If you
11 can recall, who did you speak with about this case?
12     A   I don't know their real names.  They were at
13 Lawrence, but it was dealing with the same issues because
14 their permits were revoked arbitrarily also.
15     Q   So you said you don't know their real names.
16 Do you have their nicknames or their --
17     A   Shaky.
18     Q   Anyone else?
19     A   James Walker.  That's his real name.
20     Q   I assumed.  It would be kind of an interesting
21 nickname to have.  So you said that they had the same issue
22 as you.  Can you describe what you mean by that?
23     A   Well, one had a shoulder injury and one was
24 practically disabled and was trying to get medical
25 treatment from Lawrence Correctional Facility, and they

Page 22

1  were also being denied.
2      Q   Also being denied treatment or being denied
3  permits?
4      A   Both.
5      Q   Did you prepare the complaint that you filed
6  in this case?
7      A   Yeah.  I wrote it.
8      Q   You wrote it yourself.  Did you have any help?
9      A   No.
10     Q   To the best of your knowledge, is everything
11 truthful in the complaint?
12     A   Yeah, it is.
13     Q   And have you prepared all of your responses to
14 defendants' written discovery requests yourself?
15     A   I have.
16     Q   Is everything truthful in those responses to
17 the best of your knowledge?
18     A   They are.
19     Q   Do you have any other records or documents
20 that are relevant in this case that you plan to use at
21 trial or in response to any motions that you have not yet
22 provided to defendants?
23     A   I have -- There's medical records here from
24 New Mexico that I haven't received yet.  I would use those.
25 I would use all of the medical permits that I have received

Page 23

1  in New Mexico for front cuffing.  I have permits for my
2  wrist braces, for physical therapy, objects that I have for
3  my carpal tunnel and the wrist injury, and I'm not sure if
4  I provided them to you or not.  I think I sent you the New
5  Mexico permits, though.
6      Q   Yes.  I think there was something in a letter
7  that contained some permits.  But you said that you're
8  waiting for some records; is that correct?
9      A   Well, if I need them, I'm going to use my New
10 Mexico medical records.  I haven't seen them or requested
11 them yet.
12     Q   Okay.  So I mean, if you plan to use them, are
13 you aware that you need to supplement your discovery
14 responses pursuant to the court order?
15     A   Yeah.
16     Q   Okay.  So if you plan to use them, you will
17 request them and then provide them to us?
18     A   Yes, I will.
19     Q   Okay.
20     A   You're free to request them and get them, too.
21 I'll give whatever consent you need to.
22     Q   And have you reviewed the court's merit review
23 order?  It's document seven.  I can pull it up if you don't
24 have it with you.
25     A   That's the merit review under Section 1915 or

Page 24

1  whatever?
2      Q   Yes.
3      A   Yeah.  I've read it.
4      Q   Okay.  And so you're aware that your claims
5  against Nurse Practitioner Wise are as follows:  Claim III,
6  violation of the eighth amendment for failing to adjust
7  plaintiff's pain medication from May to August of 2022, and
8  for failing to renew plaintiff's medical cuff permit, and
9  Claim IV, violation of the first amendment by Nurse
10 Practitioner Wise for retaliating against plaintiff by
11 denying his medical permit after he filed grievances about
12 the care Wise provided; is that correct?
13     A   That's right.
14     Q   And then just for Dr. Myers, it's Claim III,
15 violation of the eighth amendment by defendant, Dr. Myers,
16 for failing to renew plaintiff's medical cuff permit; is
17 that correct?
18     A   That's correct.
19     Q   So you're aware that the court dismissed your
20 claim regarding Dr. Myers and the pain medications?
21     A   Yes.
22     Q   Do you have any medical training?
23     A   No.
24     Q   Can you explain how you would request medical
25 treatment at Lawrence Correctional Center?



Page 25

1    A    You can request it verbally through a nurse or
2    nurse practitioner or doctor if you see them or through a
3    correctional officer or through inmate requests or
4    grievances.
5    Q    The inmate requests and grievances, those
6    would be written; is that correct?
7    A    Yeah.
8    Q    Would you fill out something called a sick
9    call slip?
10   A    That's just inmate requests.  They don't have
11   sick call slips.
12   Q    And then what about emergency medical
13   treatment?
14   A    You can utilize the grievance procedure.
15   Q    Is that the only way to request emergency
16   treatment?
17   A    You could tell probably any correctional
18   official who works there, and hopefully they would do
19   something for you.
20   Q    To your recollection, at Lawrence Correctional
21   Center, did you ever request emergency medical treatment
22   regarding your right shoulder or left arm?
23   A    Yes.
24   Q    And how did you request that?
25   A    Through many written requests and verbal

Page 26

1    requests to Ms. Wise and through emergency grievances and
2    regular grievances.
3    Q    Generally, can you explain to me why you're
4    suing Dr. Myers in this case?
5    A    For deliberate indifference, failing to renew
6    my medical permit.  And basically, he never even examined
7    me.  He just sat across from me and just crossed his arms
8    and dictated whatever Defendant Wise put in the medical
9    records.  And he pointed to a policy on the wall right next
10   to him that said it didn't matter what my disability was,
11   that IDOC and him would not provide any further waist
12   chaining or front cuff medical permits.
13   Q    And is this all about a single visit on
14   August 20th, 2022?
15   A    Yeah.  That's when I saw him personally, and
16   that's when all of that transpired.
17   Q    And then can you explain, generally, why
18   you're suing Nurse Practitioner Wise in this case?
19   A    For deliberate indifference and retaliation
20   and failing to accommodate me to renew my medical permit.
21   Q    In January of this year, you sent me a --
22   Well, it's like a response to request for Production No. 8
23   where you included somewhat of a timeline; is that correct?
24   A    I believe so, yeah.
25   Q    And is everything that you believe is relevant

Page 27

1    to your claims against Nurse Practitioner Wise and
2    Dr. Myers included on this timeline?
3    A    Yeah.
4    Q    Okay.  So I'm going to kind of go through
5    the -- generally, the timeline and then ask you some other
6    questions as well.  So I'll pull it up if there's something
7    particular that we need to look at, but do you have that
8    timeline with you, or no?
9    A    I have it.
10   Q    Okay.  So if -- Unless I ask you to look at a
11   document, if you could just testify based on what you
12   recall, that would be great.  I'll let you know.  If you
13   don't remember, that's fine.  Or if you need to refresh
14   your recollection, just let me know.  But I want to start
15   with your memory, and then we can go to what the documents
16   say.  Okay?
17   A    I'm going to tell you now I'm going to need to
18   refresh because my memory is bad from me being in solitary
19   for 25 years.
20   Q    Understood.  I just wanted to see what you
21   remember first and then we can go from there.  Okay?
22   A    Yeah.
23   Q    Okay.  So you arrived at Lawrence Correctional
24   Center from Pontiac Correctional Center around March 1st of
25   2022; is that right?

Page 28

1    A    Yeah.  The second time.
2    Q    And you had an existing waist chain permit
3    upon your transfer?
4    A    Yes, I did.
5    Q    And it was continued until August 15th of
6    2022?
7    A    Yeah.  By Defendant Myers.
8    Q    And did the officers use a waist chain
9    whenever you left your cell at Lawrence from March 1st, '22
10   until August 15th of '22?
11   A    Yeah.
12   Q    And then --
13   A    Front cuff.
14   Q    Or a front cuff?
15   A    Yeah.
16   Q    I think that there was something either in
17   your complaint or in some other documents that due to your
18   segregation or administrative detention status, you were
19   always cuffed when you left your cell; is that right?
20   A    Yeah.  If you're on administrative detention
21   or segregation status, you're always cuffed.
22   Q    But within your cell, you're not cuffed, I
23   would imagine.
24   A    Not generally, no.
25   Q    Okay.  You saw Nurse Practitioner Luking, L --



Page 29

1 excuse me -- L-U-K-I-N-G, on March 25th, 2022. Does that
2 sound about right to you?
3    A   I have no idea.
4    Q   Okay. Do you recall seeing her in the spring
5 of '22?
6    A   No.
7    Q   Okay. I'm going to go ahead and pull up a
8 medical record just to make it clear for you.
9    A   Were those produced in your --
10   Q   You have the medical records with you?
11   A   Yeah. I got it. Do you have a docket number
12 or DOC number?
13   Q   It would say -- On the bottom right-hand
14 corner it would say Fillmore LCC (MR). And it would be
15 pages 0061 through 0062.
16   A   Yeah. I left -- I left everything that you
17 sent me in my cell. I only brought what the AAG sent me.
18   Q   Okay. That's fine. I can go ahead and pull
19 this up for you. One second. Are you able to see this
20 document?
21   A   Yeah.
22   Q   Okay. Are you on a phone or are you on, like,
23 a laptop?
24   A   This is on a computer.
25   Q   Okay. So you're able to see it a little bit

Page 30

1 bigger?
2    A   Yeah.
3    Q   Okay. Good. Do you see the bottom of the
4 page, it says Fillmore LCC (MR) 0061?
5    A   Yeah. I have all of these documents in my
6 cell that you sent me. I'm not sure if the state sent me
7 these same ones. 3/25/22, I'm not sure if I've ever seen
8 this one.
9    Q   Okay. I'm hearing another person talking. Is
10 that in the room that you're in?
11   A   Yeah. That's Ms. Chaloupek. She's our job
12 coordinator. This is her office.
13   Q   Okay. If we ever need to take a break so she
14 can do something, just let us know. Okay?
15   A   All right.
16   Q   Okay. You see at the top it says 3/25/22?
17   A   Yeah.
18   Q   And it says NP, nurse practitioner note?
19   A   Yeah. I never saw -- Was that the date that I
20 was transferred to Lawrence, do you know?
21   Q   I believe you were transferred prior to that.
22 Let me go to the transfer note. I think that was March 1st
23 is when you transferred in. Yeah. Looking at page 51, it
24 says that you were received on the -- March 1st, 2022 --
25   A   Okay.

Page 31

1    Q   -- 7:35 p.m. So this would have been -- This
2 visit with Nurse Practitioner Luking would have been about
3 three weeks after you arrived at Lawrence. Does that sound
4 about right?
5    A   Yeah. I don't remember seeing her, but --
6    Q   Okay. So she documented that you were there
7 requesting a continuation of your waist chain permit. She
8 reviewed your chart and that you had a current permit that
9 was active through August 2022 and that it was no need to
10 have it renewed at that time; is that correct?
11   A   Yeah. Looking at my note right here, I did --
12 I did see -- I just wrote "saw NP." I didn't know what her
13 name -- I think she ordered X-rays for me, for my left
14 wrist.
15   Q   Okay. So you're looking at the timeline that
16 we were talking about earlier?
17   A   Yeah. These are just my notes.
18   Q   Okay.
19   MS. POWELL:  Alison, if I could just interrupt
20 real quick. Mr. Fillmore, if you want to be looking at a
21 paper copy, this 3/25 note is Bates 000057 that was
22 produced by my office.
23   A   Yeah. I have it.
24   Q   (By Ms. Matusofsky)  And then so -- Yeah. In
25 the top right corner, it looks like she ordered a left

Page 32

1 wrist X-ray; is that right?
2    A   Yes.
3    Q   Do you recall if you spoke with Nurse
4 Practitioner Luking about your right shoulder?
5    A   I can't remember.
6    Q   Looking at her note, would you agree that
7 there's nothing in this note about your right shoulder?
8    A   I would say that's accurate, yeah. I only
9 have shoulder injuries when it's, like, put behind my back
10 or stretched above my head. I only have limited movement
11 in my right shoulder. So I don't have constant pain in my
12 shoulder unless it's manipulated in some way, like being
13 cuffed behind the back.
14   Q   Okay. And then you would agree, looking at
15 this note, that she documented that you reported to her
16 that you have the permit because you've had multiple
17 surgeries on your left wrist, and left arm is significantly
18 shorter than right arm. This causes pins and needles when
19 cuffed in back normally.
20       Did I read that correctly?
21   A   Yeah. That could be accurate. My disability
22 is clear and obvious, so this could be documented from
23 2018, my other progress notes from Lawrence. I don't know
24 if I told her or she already knew that.
25   Q   But you would agree that it says -- Right



Page 33

1 where the number 65 is on the left side, that sentence
2 starts, "Patient reports he has the permit because" -- I'm
3 reading that directly. Did I read that correctly?
4    A   Yeah. You're correct.
5    Q   Okay. And then going to -- this is page 63.
6 It looks like you saw a nurse on April 11th, 2022,
7 complaining of left -- numbness and tingling for your left
8 wrist, hand and fingers; is that correct?
9    A   Yes.
10    Q   And this is page 63, for the record. And it
11 looks like the nurse noted that you had an X-ray scheduled
12 and that the nurse gave you ibuprofen; is that correct?
13    A   Yeah.
14    Q   Do you recall anything else about this visit
15 with this nurse?
16    A   My notes just say I saw a nurse regarding my
17 wrist numbing, the ibuprofen, waiting for X-rays, so that's
18 all I can recall.
19    Q   Okay. So you had the X-ray on April 28th of
20 2022; is that right?
21    A   Yes.
22    Q   Did anybody explain the results of the X-ray
23 report to you?
24    A   No, I don't think so. You mean that day or
25 anytime ever?

Page 34

1    Q   Anytime afterwards, did anybody explain that
2 to you?
3    A   Probably regarding like the -- just the
4 degenerative changes in my bones and the previous injuries
5 reported on that X-ray, that they can see that they are on
6 that X-ray.
7    Q   I'm going to stop sharing for a second. Okay.
8       Now I'm going to pull up the complaint that
9 you filed in this case, and I'll show you it in just a
10 second. This is -- It says document one at the top. Is
11 this the complaint that you filed with the court?
12    A   Yeah.
13    Q   So I want to go to page three of this
14 complaint, paragraph 13. You said that plaintiff suffers
15 ossific density near his left ulnar styloid. Where did you
16 get this diagnosis?
17    A   From an X-ray finding.
18    Q   From the April 2022 X-ray?
19    A   I'm not sure. I've had multiple X-rays since
20 1998 on my left wrist, and it was either from the first
21 X-ray or the last X-ray, but that's where that comes from.
22    Q   Okay. Do you have copies of your older
23 X-rays, or no?
24    A   I believe so. Maybe.
25    Q   Not necessarily with you right now, but just

Page 35

1 generally, do you have copies of those?
2    A   I know I did at one point.
3    Q   Okay. And then looking at your records, it
4 looks like you saw Nurse Practitioner Wise for the first
5 time on May 20th, 2022.
6       Does that sound about right to you?
7    A   If I have to guess, I would say yeah, without
8 looking at my notes.
9    Q   Okay. Without looking at your notes,
10 generally what do you recall about this first appointment
11 with Nurse Practitioner Wise?
12    A   It had to do something with my left wrist
13 injury, I'm sure, pain and numbing to my fingers and wrist
14 that I was having.
15    Q   Do you remember if she explained your X-ray
16 results to you?
17    A   I do not, not without looking at my notes.
18    Q   So looking at your timeline, it says 5/20/22,
19 saw NP Wise, orthopedic surgeon recommended.
20    A   Yeah. She told me that she was going to send
21 me to get an EMG.
22    Q   Are you aware that EMGs aren't with
23 orthopedics?
24    A   I don't know. That's what she told me right
25 there, so I wrote that down.

Page 36

1    Q   Okay. Are you aware that EMGs are with
2 neurology, it's something to do with the brain and the
3 nerves?
4    A   I don't know.
5    Q   Okay. So when you say orthopedic surgeon,
6 you're referring to the EMG referral?
7    A   I just wrote down what she told me.
8    Q   Okay.
9    A   She said ortho.
10    Q   Understood. I'm going back to sharing the
11 medical records. So this is Fillmore LCC (MR) 0073. Does
12 it say 5/20/22 in the left-hand corner?
13    A   Yeah.
14    Q   And does it say NP, nurse practitioner note?
15    A   It says NP note.
16    Q   Yes. So looking at the note, it says,
17 "Individual in custody coming in D/T" -- that's due to --
18 "X-ray follow-up. Individual in custody comes in and
19 reviewed X-ray results and discussed with individual."
20       Do you recall discussing those with her now
21 that you're reading this?
22    A   No.
23    Q   Okay. And then it says -- Go ahead.
24    A   It could be accurate. I don't remember,
25 though.



Page 37

1    Q    And then it continues, "States that he woke up
2  with numbness and noticing decreased range of motion."
3         Did I read that correctly?
4    A    Yeah.
5    Q    And I'll represent to you that the C with the
6  line over it, that's medical jargon for the word "with".
7    A    All right.
8    Q    It's Latin.  I had to look it up, too.  Don't
9  worry.  My Google history is a lot of, what does this
10  abbreviation mean.  So we're all in the same boat there.
11    A    All right.
12    Q    So then looking at the -- the objective
13  section of this note, the O section, it says, "Individual
14  is restrained at this time, so minimal movement is seen.
15  Obvious shortening of left arm is seen.  X-ray shows
16  chronic and degenerative changes."  That's a little delta
17  sign, changes.
18         "No obvious reason for waist chain permit is
19  seen at this time.  Will do EMG to evaluate for numbness of
20  the left arm."
21         Did I read that correctly?
22    A    Yeah.
23    Q    Okay.  Did she explain to you what the EMG
24  test was going to do?
25    A    No.

Page 38

1    Q    And do you recall anything else about this
2  appointment besides what we've already talked about?
3    A    No.
4    Q    And so this time, even though she said that no
5  obvious reason for waist chain, you still had the waist
6  chain permit still; is that correct?
7    A    Yeah.  It was good until August, I believe.
8    Q    So she didn't cancel it in May, it was
9  continuing until August?
10    A    It was -- When I got to Lawrence, it was
11  continued by Defendant Myers.
12    Q    Okay.  But I just wanted to clarify that when
13  you saw Nurse Practitioner Wise in May of '22, she didn't
14  cancel your permit, she just didn't renew it; is that
15  correct?
16    A    That is correct.
17    Q    Okay.  So she didn't say, he's done with the
18  permit, no more permit; it's just I'm not going to renew it
19  at this time; is that correct?
20    A    I'm not sure.
21    Q    Okay.
22    A    I'm not sure.
23    Q    If my question is confusing, sorry about that.
24    A    That's all right.
25    Q    And then in your timeline, you said that you

Page 39

1  wrote to her on June 1st, 2022 regarding, have not received
2  any medical treatment for wrist; is that correct?
3    A    I have no idea unless I look at my notes.
4    Q    Okay.  Sorry.  I was reading off of your
5  timeline.  Is that correct?
6    A    Well, if it's what I sent you, yeah, that's
7  correct.
8    Q    Okay.  And then do you remember how you wrote
9  to her?  Was this through institutional mail?
10    A    Yeah.  It had to be through inmate requests,
11  sick call.
12    Q    Did she respond to your sick call slip or your
13  letter?
14    A    I don't believe so.
15    Q    Do you know if she --
16    A    As far as --
17    Q    Go ahead.
18    A    As far as answering that request specifically?
19  I don't think any medical official does that ever.
20    Q    Do you know if she received your June 1st,
21  2022 letter or slip?
22    A    I would hope so.
23    Q    But you don't know for sure?
24    A    No.  I'm locked in a cell 24 hours a day.  I
25  don't know what's happening out there.  I'm at the mercy of

Page 40

1  prison officials.
2    Q    And then I'm going to go to -- This is page 77
3  of the medical chart.  "June 10, 2022, nurse practitioner
4  note, chart review performed for pain that has continued
5  for arm.  Will write for Mobic to help with any
6  inflammation," and then prescription of Mobic for six
7  months.
8         Do you recall Nurse Practitioner Wise
9  prescribing you Mobic?
10    A    Somebody did because I received it after I was
11  complaining of not receiving medical attention.
12    Q    So you weren't sure if it was her that
13  prescribed it or if she was the one that prescribed it, but
14  somebody did?
15    A    Yeah.  Somebody did because I received it.
16    Q    But you weren't seen -- Go ahead.
17    A    After several complaints and talking with,
18  like, the AD lieutenant and sergeant about not receiving
19  medical treatment, I think Lieutenant Piper called somebody
20  or talked to Wise, and then I got that shortly after, days
21  later, I think --
22    Q    All right.
23    A    -- if I remember correctly.
24    Q    I'm going to pull up your timeline just so we
25  can look at it together.  I know you have it with you, but

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com            California Firm Registration #179

LEXITAS

Page 41

1  that way, we can just look at it together.  I'm going to
2  share that with you now.
3         And for the record, I'll scroll to the top,
4  but at the top of this page it says, "Document response to
5  No. 8, defendants' request for production of documents."
6         Did I read that correctly?
7     A  Yes.
8     Q  And this was sent to me in January of 2024?
9     A  I can't remember.  I think -- I think -- I
10  sent it to you as a supplemental when I had to make copies,
11  I think.
12     Q  Okay.  Do you agree that in the bottom
13  right-hand corner of this first page that there's a stamp
14  that says received January 11, 2024?
15     A  Yeah.  I didn't put that there.
16     Q  Okay.  I'll represent to you that that was
17  from my office --
18     A  Okay.
19     Q  -- that they date-stamped it to let us know
20  when it was received so we had documentation of that.  So
21  looking at the timeline, it says, "6/6/2022, talked to AD
22  sergeant.  He called NP Wise.  Stated approved on 6/1 to
23  see ortho."
24     A  Yeah.  I was told that by my sergeant.
25     Q  Okay.  So when he called Nurse Practitioner

Page 42

1  Wise, were you present for that call?
2     A  No.
3     Q  So he wasn't on a walkie talking in front of
4  you, he went somewhere else to talk to her and then came
5  back to report you what she said?
6     A  Either called on the phone or he went
7  over there and talked to her herself.  I don't know, but
8  that's what he told me when he came back.
9     Q  So he told you Nurse Practitioner Wise said
10  that you were approved on June 1st to go see the ortho,
11  that's what he told you?
12     A  Yeah.
13     Q  Okay.
14     A  That was in some of my grievances, too, that
15  that was her response.
16     Q  Her response to your grievance?
17     A  Yeah.  Some of my grievances, her response was
18  I was approved on 6/1 to go see the ortho.
19     Q  Okay.  So we'll look at those grievances in a
20  minute.  I don't think the ones that we're talking about
21  you've filed yet.  So I will pull those up in a few, but I
22  just wanted to follow up on a few things.
23         And then in your timeline, you state,
24  "June 30th, 2022, sent for med renewal, said meds aren't
25  working, ineffective."

Page 43

1         When you say sent for med renewal, what did
2  you mean by that?
3     A  It had to be inmate request, sick call.
4     Q  So there wasn't like a renewal form, it was
5  just a slip that you submitted to say, I'm running low on
6  medication, I need a refill?
7     A  Yeah.  Just on an inmate request.  There are
8  no sick call slips or medicine renewals.  I don't think
9  Illinois has that.  If they do, I've never seen them.
10     Q  So your slip said, I'm running low on the
11  meloxicam or the Mobic, but it doesn't work.  Is that what
12  you essentially said in your slip?
13     A  It could be.  I know I told them it was
14  totally ineffective.
15     Q  Do you have a copy of that slip?
16     A  I don't, no.  I sent the only one to medical
17  or healthcare, Ms. Wise.
18     Q  Do you know who receives the medication
19  renewal sick call forms?
20     A  No.
21     Q  Do you know if Nurse Practitioner Wise ever
22  saw your note?
23     A  I hope so.
24     Q  But you don't know for sure?
25     A  I do not know.  I know she kept prescribing

Page 44

1  them after I kept complaining they were totally
2  ineffective.
3     Q  And then looking at the note -- or your
4  timeline, you then say on July 10, 2020 to -- you wrote
5  Nurse Practitioner Wise regarding your medical permit
6  renewal; is that right?
7     A  Yeah.
8     Q  And that was also through institutional mail?
9     A  Yes.
10     Q  And did she ever respond to this in writing or
11  verbally?
12     A  I don't believe so.
13     Q  And do you know if she received this
14  institutional mail from you?
15     A  I hope so.  But again, I'm at the mercy of the
16  prison officials to do what's right and deliver my mail.
17     Q  So you would agree that Nurse Practitioner
18  Wise is not the one that comes to pick up your mail; is
19  that right?
20     A  I have no idea.  I can't agree to that, no.
21     Q  So you don't know if she's the one that comes
22  to your cell to get your mail?
23     A  I don't know.  She could.  Nurses pick up sick
24  call slips or inmate requests to sick call, or they pick
25  them up in the box out there.  I don't know process, but



Page 45

1  there's nothing barring her from doing that.

2      Q   Do you recall her ever coming to your cell to

3  get your mail?

4      A   No, because I would just put it in the door

5  and fall asleep.

6      Q   And then you also state that on July 13, 2022,

7  you wrote, "Healthcare/NP Wise RE:  Meds renewal -- meds

8  permit renewal."  Is that correct?

9      A   Yes.

10      Q   And when you say healthcare/Nurse Practitioner

11  Wise, what does that mean?

12      A   The inmate request, that's directing where

13  it's going, healthcare to NP Wise.

14      Q   Okay.  So it was, just to clarify, I want this

15  to go to healthcare and I want Nurse Practitioner Wise to

16  see this?

17      A   Yes.  It was for her.

18      Q   Okay.  And that was also through institutional

19  mail?

20      A   Yes.

21      Q   And did she ever respond to your letter?

22      A   I don't believe so.

23      Q   And similar, before, do you know if she

24  received this letter?

25      A   Again, I would hope so, but I don't know.  I'm

Page 46

1  in solitary.  I don't know what happens outside of my cell.

2      Q   Okay.  And then looking here, it says,

3  July 18, 2022, wrote Emergency Grievance No. 7-22-178; is

4  that correct?

5      A   Yes.

6      Q   And do you have that grievance with you?  I

7  can pull it up if you don't.

8      A   I know I had it in the discovery that you

9  produced, but I'm not sure about what --

10      Q   I can pull it up since it's on my computer

11  right here and you're looking at the screen.  Probably

12  easier for everybody.

13      Okay.  So for the record, I'm showing the

14  witness a document labeled Fillmore ARB 0020 through 0033.

15  We probably won't look at the whole thing, but -- Okay.  So

16  looking at this, this is from the ARB.  So this is the

17  documents, I believe, that you sent to the ARB along with

18  this particular grievance.  Is this the grievance that you

19  were referring to for that timeline?

20      A   That is the front page of it.

21      Q   Yeah.  I'll scroll down, but is this the

22  grievance that you're referring to, the 7/18/22 grievance?

23      A   Yeah.  That's correct.

24      Q   Okay.  So page one of the grievance is on page

25  labeled 22, and then page two of that grievance is on

Page 47

1  page 23; is that right?

2      I can zoom in if you need to see the page

3  number better.

4      A   Yeah.  That's correct.

5      Q   Okay.  And so looking at the -- Strike that.

6  So this grievance, you marked it as emergency; is that

7  right?

8      A   Yes, I did.

9      Q   And then the warden designated it as an

10  emergency; is that correct?

11      A   That's correct.

12      Q   Okay.  So then the grievance officer responded

13  to your grievance in August of 2022; is that correct?

14      A   Yes.

15      Q   And then under the response on page -- this is

16  on page 21 of this document.  It says, "Fillmore B63343 has

17  been and continues to be seen and treated by HCU staff.

18  Prescribed medication issued on 6/11/2022, 7/18/2022 and

19  8/2/2022 per HCUA Cunningham."

20      Is that correct?

21      A   That's what it says.

22      Q   Okay.  I read that correctly?

23      A   I'm not sure if that's correct, though.

24      Q   But I read that correctly?

25      A   Yes.

Page 48

1      Q   Okay.  Do you see any response, at least on

2  this form, from Nurse Practitioner Wise?

3      A   I don't, no.

4      Q   And then what about on the original form, is

5  there anything on here that suggests that she sent you a

6  response to this grievance?

7      A   Not on this grievance, no.

8      Q   And then it looks like you submitted some

9  additional documents to the ARB, including some medical

10  records and permits.  I'm just going to scroll up.  Do you

11  know if Nurse Practitioner Wise saw this grievance?

12      A   I don't know.

13      Q   Did she ever talk to you about this grievance?

14      A   I can't remember.

15      Q   And so this, it looks like it says at the top

16  of the response to offender's grievance form on page 21, it

17  says, "Date received, July 21st, 2022; date of review,

18  August 4th, 2022."  Is that right?

19      A   Yeah.  That's what it says.

20      Q   Okay.  And then the response from, it seems,

21  HCUA Cunningham included the dates August 2nd, 2022; is

22  that right?

23      A   Yes.

24      Q   So presumably, this response was provided

25  after August 2nd, 2022?



Page 49

1      A   I would guess, yes.

2      Q   Okay.  Just trying to go in order here, so I'm
3  jumping around with a lot of documents, but I'm trying to
4  stay chronologically in order.

5          MS. MATUSOFSKY:  We have been going for about
6  an hour.  Is everyone good to keep going, or do you want to
7  take a break?

8          THE WITNESS:  I'm fine.

9          MS. MATUSOFSKY:  Jennifer, thumbs up from you?
10  Jamie, you the same?  I just wanted to check.  If anyone
11  wants a break at any time, just unmute yourself or ask.

12      Q   (By Ms. Matusofsky) Let's keep going.  Going
13  back to the -- going back to your timeline, and I'll put
14  that up on the screen.  So at the bottom of the first page
15  that you provided says, "July 22nd, 2022, talked to
16  Lieutenant Piper RE pain meds.  He talked to NP Wise."

17          Were you present for Lieutenant Piper's
18  conversation with Nurse Practitioner Wise?

19      A   No.  That was just his report back to me.

20      Q   So he just told you that he talked to her?

21      A   Yeah.

22      Q   Did he tell you what she said?

23      A   Did I write it on those notes to you?

24      Q   I'm sorry?

25      A   Did I write it on those notes to you?

Page 50

1      Q   This is all I see right here.  It says,
2  "Talked to NP Wise," and then it goes to the next page.
3  And I'll talk to you about that in a minute, but this is
4  all it says about your conversation with Lieutenant Piper.

5      A   I wouldn't know further unless I could look at
6  my notes here.

7      Q   And when you say your notes, is that something
8  separate than this timeline?

9      A   No, it's the same thing as here.  I just don't
10  know if I included everything or what.

11      Q   Okay.  You can look at your notes if you want,
12  at least right now.  But this is what we received from you.
13  So it's safe to say it's the same document, the document is
14  the same?

15      A   Yeah.  That's all I have right there.

16      Q   Okay.  And then I'm going to stop sharing for
17  a minute just so I can get your recollection on this.  You
18  then wrote on your timeline that you saw Nurse Practitioner
19  Wise on the yard on July 22nd, 2022; is that right?

20      A   Yeah.  She was walking past while we were in
21  the cages.

22      Q   And can you describe that interaction that you
23  had with her?

24      A   She walked by with another nurse or somebody,
25  and I just informed her about my injury I was having to my

Page 51

1  wrist and pain meds.  And she just looked and laughed and
2  walked away.

3      Q   When you said that she looked, did she look at
4  you?

5      A   Yeah.

6      Q   Did you guys make eye contact?

7      A   I told her who I was before, but she knew who
8  I was.  She looked right at me.

9      Q   We'll go back to your timeline.  It says,
10  "7/22/22 at 10:00 a.m., saw NP Wise on yard.  Told her
11  about no pain meds.  She looked at me -- kept walking,
12  deliberately ignoring me -- she laughed."

13      A   Yeah.

14      Q   About how long was your interaction with her
15  at 10:00 a.m.?

16      A   Just seconds that she walked past and stopped
17  and then kept walking.

18      Q   And then you wrote, "10:30 a.m., NP Wise
19  treated me as a nuisance when I complained of pain in
20  wrist, not receiving pain meds."

21          Did I read that correctly?

22      A   Yeah.

23      Q   So did you see her twice that morning?

24      A   Yeah.  She was inside the AD building unit
25  eight when we were being escorted in from the yard.  And I

Page 52

1  was asking her about permit renewal and medications, and
2  she just blew me off and I kept going.

3      Q   And about how long was this interaction?

4      A   Thirty seconds, maybe a minute.

5      Q   Was this the last time that you saw Nurse
6  Practitioner Wise?

7      A   I can't remember without looking at my notes
8  or reviewing grievances.  I can't remember offhand.

9      Q   Okay.  So I'll just scroll through your
10  timeline really quick, just so we can be clear.  I'll let
11  you read it, just review it really quickly, but let me know
12  if you see anything that says, saw Nurse Practitioner Wise,
13  or anything like that.  Okay?

14      A   Yeah.

15      Q   So let me know when you're ready to scroll to
16  the next page.

17      A   I'm ready.  I'm ready.

18      Q   This is the end.  So do you see anything else
19  in your timeline, at least, that you saw her again?

20      A   Yeah.  Not that I wrote, no.

21      Q   So I'm going to go up to -- this is the second
22  page of the document you sent us.  This is the July 25th,
23  '22, grievance against NP Wise.

24          I did not find a grievance in the records that
25  we received from the facility regarding -- or from the IDOC

Page 53

1  regarding this July 25, 2022 grievance.  Do you have a copy

2  of that grievance?

3      A    I might have.  I know some of them I wrote,

4  and they never -- I never got a response at all, so they

5  were good at throwing away grievances.  But that could have

6  been one of them.

7      Q    If you had a copy, would you be able to

8  provide that to me?

9      A    Yeah, I will.

10     Q    And can you let me know one way or another if

11  you have a copy or not?

12     A    Yeah.  Let me just write that down so I don't

13  forget.

14     Q    Yep.  That's fine.

15     A    All right.

16     Q    And if you can remember, what did this

17  grievance discuss or talk about?  What did you talk about

18  in this grievance?

19     A    There had to be something with denial of

20  medical care and deliberate indifference or maybe

21  retaliation, permit renewal, something, because that was my

22  only complaints against her, really.

23     Q    Okay.  So when you say retaliation --

24  Actually, strike that for now.

25          Do you know if Nurse Practitioner Wise saw

Page 54

1  this July 25th, 2022 grievance?

2      A    I don't know.  I would hope so.  If it was

3  written against her, usually those officials are given

4  notice.

5      Q    But you would agree that the other grievance

6  we looked at earlier just had a response from HCUA

7  Cunningham; is that right?

8      A    Yes.

9      Q    So I want to show you a document in the

10  medical chart.  I think you included it with your

11  grievance, but this one is a little bit easier to read.  I

12  think the one that you provided with your grievance is a

13  copy, so it didn't look the best when it was copied again.

14  So I will pull up that document really quickly.

15          So this is Fillmore LCC (MR) 0257, and it

16  says, "Laboratory and radiology summary, date 7/25/22."

17          Is that correct?

18     A    Yeah.

19     Q    And it's -- The handwritten note says, "Your

20  Mobic was renewed on June 10, 2022.  Chart review was

21  performed, and at this time, you do not qualify for waist

22  chain permit.  Will not renew permit.  M. Wise, FNP."

23          Is that correct?

24     A    Yeah.  The grievance was on this, I think.

25     Q    I'm sorry?

Page 55

1      A    The grievance on the 25th was about this right

2  here, if I remember correctly.

3      Q    Okay.  So you think that you wrote the

4  grievance about -- You received this document and then you

5  wrote the grievance?

6      A    Yeah.  I think I got this maybe that same day.

7      Q    Okay.  And then going back to your timeline, I

8  don't see anything on this timeline about receiving the

9  radiology summary from Nurse Practitioner Wise.  Was that

10  just an oversight?

11     A    No.  That wouldn't be something I would have

12  wrote down as receiving.

13     Q    Okay.

14     A    These are my interactions with staff and what

15  I did concerning my complaints.  I documented all of that,

16  not dates that I received something from something in the

17  mail.

18     Q    Okay.  Understood.  Did Nurse Practitioner

19  Wise ever talk to you about grievances?

20     A    I think so, one time when I was being

21  examined.  She was aware of grievances that I filed.

22     Q    So when you say, one time when you were

23  examined, so looking at the medical --

24     A    I can't remember if it was one time or several

25  times, but it was -- I would say it was probably more than

Page 56

1  once because I wrote a lot of grievances about all of this.

2      Q    I understand that.  But when you say that she

3  talked to you about it when she examined you, looking at

4  your medical chart, it looks like she only examined you the

5  one time in May of 2022; is that correct?

6      A    I don't know without reviewing my medical

7  chart.

8      Q    Okay.  But we went through your timeline, and

9  after that May 20th, 2022, there was no other note in there

10  that you saw her for an evaluation; is that correct?

11     A    Well, if I can look at my notes, I can tell

12  you.

13     Q    Yeah.  That's fine.

14     A    After May 20th you're saying?

15     Q    Yes.  May 20th, 2022.

16     A    I saw her on July 22nd when she walked past

17  the yard at 10:00 a.m.

18     Q    Correct.  But you said examination; is that

19  right?

20     A    Say that again.

21     Q    You were referring to her talking about the

22  grievances during an examination of you.  Did she examine

23  you on July 22nd, 2022?

24     A    No.  I think this was at that 10:30 timeline

25  on July 22nd.



Page 57

1    Q   So she evaluated you?
2    A   No, she was just in a room with another nurse,
3  and we were just there with the other staff coming in.  And
4  I think she said she got a grievance or received a
5  grievance and she would get back to me.  It was somewhere
6  along those lines.
7    Q   So that was in that 30-second conversation
8  that you had with her at 10:30 a.m.?
9    A   Yeah.
10    Q   Okay.  But going back to your -- Actually,
11  strike that.  One second.
12        When she talked to you about receiving the
13  grievance, was she upset, was she annoyed, or did she just
14  tell you that she got the grievance and she would get back
15  to you about it?
16    A   Well, she was annoyed and just treated me as a
17  nuisance.
18    Q   And I'm going to pull up another grievance, I
19  think, in your -- We'll pull up the timeline first so we
20  can go to the grievance next.  So in the timeline, you
21  wrote, "7/31/22, wrote grievance, denied permit renewal --
22  retaliation."
23        Is that correct?
24    A   Yeah.
25    Q   Okay.  And I'll pull that grievance up.  For

Page 58

1  the record, I'm showing the witness Fillmore LCC (GR) 0052
2  through 0054.
3        Is this the grievance that you filed on
4  July 31st, 2022?
5    A   What's the date on top?
6    Q   It's a little bit hard to read, but I think
7  the date is right here at the bottom.
8    A   Yeah.  I see it.
9    Q   And then I'll scroll on the second page.  So
10  is this the full grievance that you filed?
11    A   Probably.
12    Q   Okay.  And then looking at -- Well, strike
13  that.  Did you file this as an emergency grievance or as a
14  non-emergency grievance?
15    A   Non-emergency.
16    Q   So there's a response from the counselor, it
17  looks like, on August 2nd -- Or excuse me.  It was received
18  on August 2nd, 2022 and responded to on August 5th, 2022;
19  is that right?
20    A   That's what's written.
21    Q   And then it reads, "Per HCUA/ADA Coordinator
22  Cunningham, per medical chart, individual has no obvious
23  reason for a waist chain permit -- will do EMG to evaluate.
24  Pain medication has been reviewed -- received or reviewed."
25  I think it says reviewed.  And then it says, "Individual

Page 59

1  does not qualify for waist chain permit and has been
2  medically examined for ADA needs."
3        Did I read that correctly?
4    A   Yeah.
5    Q   So at least looking at this, do you see any
6  response from Nurse Practitioner Wise?
7    A   I don't -- I don't know.  I don't think Wise
8  answered grievances.  Only certain individuals answered
9  grievances.  So at Lawrence, it would be Cunningham.  No
10  matter what type of medical grievance you complained about,
11  Cunningham is going to respond, not Dr. Myers, not Wise,
12  they don't personally respond to grievances.  In thirty
13  years being locked up, I have never seen that happen.
14    Q   One second.  I'm going to make sure I'm not
15  skipping around too much.
16        Okay.  So just to talk to you about what you
17  just said about never seeing anyone respond besides
18  Cunningham, I'm going to pull up -- bring it a little bit
19  out of order here.  I just don't want to lose this train of
20  thought.
21        So this is a grievance -- showing the witness
22  a document -- this is from the records that we received
23  from the AG's office.  So it's labeled, "Fillmore versus
24  Jeffreys, et al. (22-2705) Document Number:  000152 through
25  000153."

Page 60

1        So is this a grievance that you wrote dated
2  August 20th, 2022?
3    A   Yes.
4    Q   Okay.  It looks like this grievance was about
5  the August 20th, 2022 appointment you had with Dr. Myers;
6  is that right?
7    A   Yeah.
8    Q   And then looking at the counselor's response,
9  it says, "Per response from Dr. Myers, individual was
10  assessed by the" -- I'm going to zoom in.  "Individual was
11  assessed by the provider.  X-ray, EMG and pain meds.  He is
12  not a candidate for an ADA permit.  Any changes will be
13  evaluated, per response by ADA Coordinator Cunningham.
14  Individual being seen and treated by a licensed provider."
15        Did I read that correctly?
16    A   Yeah.  That's what that says.
17    Q   So at least according to this, Dr. Myers did
18  provide a response to your grievance; is that correct?
19    A   I don't know.  I didn't see his response.
20  This is something written by a counselor.
21    Q   Okay.  But at least according to this, it
22  says, per response Dr. Myers.
23        So at least they provided a response to the
24  counselor?
25    A   In some form that I never saw.



Page 61

1    Q   Do you know if Nurse Practitioner Wise saw
2  your July 30th, 2021 grievance?
3    A   I have no idea.  I would assume so if it was
4  written against her.  Grievances go against those prison
5  officials.
6    Q   But as you sit here today, are you sure that
7  they reviewed them or were given them, or is it possible
8  that the HCUA was the one that reviewed the grievances?
9    A   Anything is possible, but I would hope that
10  she would have saw it and addressed it if it was against
11  her.  Nobody else can answer for that.
12    Q   So that would be the same as -- Would your
13  response be the same as to your August 7, 2022 grievance,
14  that you don't know if she saw it or not, but that you
15  would hope that she did?
16    A   I didn't personally see that she saw it,
17  but -- I understand how corrections work, if you have a
18  grievance against that official, that official sees it.
19    Q   Okay.  I'm going to show you the grievance
20  just to make it -- you'd think after doing this for four
21  years now, I would figure out how Zoom works but still
22  having some issues here.
23        So I'm showing the witness Fillmore ARB 0018.
24  Is this your August 7, 2022 grievance?
25    A   Yes.

Page 62

1    Q   And it looks like it says under counselor's
2  response, "Per written response from HCU Cunningham, review
3  medical chart documentation.  Individual seen and treated
4  by licensed Illinois provider on 8/20/22 -- nurse sick call
5  on 8/11/22 -- NP note on 7/25/2022, optometry 6/24/22, NP
6  note on 6/10/22, NP note on 5/20/22.  Nurse sick call on
7  5/12/22 canceled.  X-ray completed 4/28/22.  Review of
8  medication issued 8/24/22, 8/5/2022, 8/2/2022, 6/11/2022."
9        Did I read that correctly?
10    A   Yeah.  That's what that says.
11    Q   Okay.  So at least based on this response
12  here, there's nothing suggesting that Nurse Practitioner
13  Wise respond to this grievance; is that correct?
14    A   I have no idea, but she communicated that with
15  Cunningham, and that's what the response was.  Again, the
16  grievance was against Wise, I believe, also.
17    Q   But you agree that it says review medical
18  chart documentation.  This is kind of a summary of what
19  HCUA Cunningham was reviewing from the chart.
20    A   I would speculate, yes.
21    Q   Looking next on your timeline, it says -- Let
22  me share it for you.  It says, "8/11/22, saw nurse.
23  Ineffective meloxicam.  Pain and numbing, left wrist.
24  Prescribed acetaminophen 325 milligrams, referred to NP."
25        Is that correct?

Page 63

1    A   Yeah.
2    Q   So I'll look at the medical chart.  This is on
3  page Fillmore LCC (MR) 0085.
4        Is this the visit that you were referring to
5  on August 11, 2022?
6    A   I believe so, yeah.
7    Q   So at this visit, it looks like you complained
8  of numbness to your left hand and fingers and that Mobic
9  was not helping; is that right?
10    A   Yeah.
11    Q   And then it looks like they referred you to
12  the NP or the doctor; is that right?
13    A   That's what it indicates, yeah.
14    Q   And they circled acetaminophen, so that would
15  be the Tylenol that you were given?
16    A   Yeah.
17    Q   And now I'm going to scroll down to page 87,
18  and this is the visit with Dr. Myers on August 20th, 2022;
19  is that right?
20    A   I don't know.  He didn't write anything in
21  front of me.
22    Q   Okay.  I'll go back to your timeline then.  So
23  it says 8/20/22, and I'll read it for you.  It says, "Saw
24  Dr. Myers.  He stated, per policy, no more waist chain
25  medical permits no matter the disability, pain, discomfort

Page 64

1  or ADA.  He refused to issue permit.  Informed him of
2  ineffective meloxicam.  He said NP Wise already denied me
3  permit.  He would not go against her."
4        Do you see that?
5    A   Yeah.
6    Q   Okay.  And besides that summary, do you recall
7  anything else about your visit with Dr. Myers?
8    A   Just that he showed me a policy that was on
9  the wall next to him that I requested through discovery,
10  but I have yet to receive saying that --
11    Q   Go ahead.
12    A   Just saying that there would be no more front
13  cuffs and waist chain permit no matter disability or ADA.
14  It was something along those lines.  And he just crossed
15  his arms.  He wasn't writing any of this right here.  He
16  didn't have any -- I don't think any paperwork in front of
17  him.  He just had his arms crossed the whole time sitting
18  across the table from me.
19    Q   Do you know if the policy, if it was an IDOC
20  policy?
21    A   It had IDOC letterhead on it.
22    Q   So it didn't say Wexford on the top, it said
23  IDOC?
24    A   I don't remember seeing Wexford on there, no,
25  but it could have been.

Aaron Fillmore                                          March 26, 2024

Page 65

1    Q   So looking at this note, it says, "In '82,
2  removed the growth plate and the left arm is shorter than
3  the right arm."
4         I'll zoom in a little bit.  "The hand/arm will
5  on occasion go numb.  Also complaint of pain in the arm.
6  Tylenol has helped in the past to decrease the pain.
7  Request waist chain by patient."
8         And then it says, "Scheduled for an EMG.
9  X-ray 4/22.  Wrist, chronic and degenerative changes, good
10  capillary or cap refill, left good motor."
11        Do you see that?
12   A   Yeah.  I don't know what that means.
13   Q   Okay.  Do you recall discussing with him that
14  Tylenol helped you in the past?
15   A   Yeah.  I told him that.  Sometimes it helped.
16   Q   Okay.  And then in the assessment section, it
17  says, "Discussed Tylenol use and the scheduled EMG."  And
18  then in the right-hand side it says, "Tylenol
19  500 milligrams as needed three times a day for six months."
20        Do you recall him prescribing you Tylenol?
21   A   No.  He never discussed any of that, but I did
22  receive it later on.  But he already knew that it was
23  ineffective due to my prior grievances and complaints about
24  the ineffectiveness of that medication.
25   Q   Of Tylenol?

Page 66

1    A   Yeah.  For like long-term pain treatment.  It
2  really didn't do anything.
3    Q   Okay.  But you would agree, I believe you just
4  testified, that you talked with him that Tylenol had helped
5  you in the past; is that correct?
6    A   Yeah.  Not long-term -- not for like long-term
7  treatment.
8    Q   Okay.  And are you aware that you were
9  prescribed the Tylenol to take along with the Mobic?
10   A   That was never explained to me until I got to
11  New Mexico.  Only --
12   Q   Go ahead.
13   A   Only these New Mexico officials explained to
14  me how it was -- how I was supposed to take it, when I was
15  supposed to take it, but none of that was communicated to
16  me in Illinois.
17   Q   Were you given both the Tylenol and the Mobic
18  on med line?
19   A   When?
20   Q   Or by the nurses to keep on your person?
21   A   When?  In Illinois?
22   Q   Correct.
23   A   Yeah.  They pass it out.
24   Q   So at any given time after August of 2022, you
25  had both Tylenol and Mobic at the same time?

Page 67

1    A   Yeah.  That's what I was complaining that was
2  ineffective.  Yeah.
3    Q   When you talked with Dr. Myers about the
4  policy about waist chains, did he tell you that it was an
5  IDOC policy?
6    A   No, he just pointed to the wall and had me
7  read it and then shrugged his shoulders like he wasn't
8  going to do anything.
9    Q   Did he say anything about whether medical
10  staff had the authority to override the policy?
11   A   No.
12   Q   Did Dr. Myers perform any physical examination
13  of you that day?
14   A   No.
15   Q   He didn't touch your wrist or anything?
16   A   Nothing.  He sat across the desk with his arms
17  folded the entire time.
18   Q   Did you discuss the EMG test with Dr. Myers?
19   A   No.
20   Q   And do you recall anything else about this
21  visit with him besides what we've already talked about?
22   A   Besides what was written in the complaint and
23  today, no, I don't believe so.  That's it.
24   Q   Okay.  And then I'm going to go to this
25  August 20th grievance again that we already talked about a

Page 68

1  little bit earlier, and that was the IDOC Bates labeling
2  000152 and 153.  So I'm going to give you a chance to
3  review this grievance quickly.  Let me know when you're
4  ready for me to scroll.
5    A   I'm ready.
6    Q   Here, I'll let you look at the response again.
7    A   Yeah.  I'm ready.  I'm familiar with this
8  grievance.
9    Q   All right.  And so you wrote this grievance
10  the day of your appointment with Dr. Myers; is that
11  correct?
12   A   I believe so, yeah.
13   Q   So that appointment was fresh in your mind
14  when you wrote this grievance?
15   A   It should have been, yeah.
16   Q   And would you agree that in the grievance, you
17  did not write that nurse practice -- Strike that.  And
18  would you agree that in the grievance, you don't state that
19  Dr. Myers told you that since Nurse Practitioner Wise
20  already denied your permit, he wouldn't go against her?
21   A   If it's not written, yeah, I didn't write it.
22   Q   And it looks like the grievance says, "Looking
23  at the first page, Dr. Myers informed me that pursuant to a
24  new policy that my medical waist chain permit will not be
25  renewed.  Per policy, all max security individuals will be

Page 69

1  denied medical permit for front cuffing/waist chain for
2  yard, et cetera."
3           And I think that was the end of that sentence.
4  So would you agree that the grievance says that per a new
5  policy, all maximum security individuals will be denied
6  medical permits for front cuffing or waist chains?
7      **A   That is -- Yeah.  That's based on the policy**
8  **that he pointed to that was on his wall in his office.**
9      Q   Okay.  So at least what's outlined in this
10 grievance, you described that the reason for denying your
11 permit was due to the new policy, not Nurse Practitioner
12 Wise; is that correct?
13     **A   In this grievance specifically?**
14     Q   Correct.
15     **A   No, this is against Myers and the policy.**
16     Q   Okay.  But specifically here, it says that he
17 would not renew your permit because of the policy; is that
18 correct?
19     **A   That's what he said, yeah.  That was his**
20 **deliberate indifference towards me based on a policy on his**
21 **wall.**
22     Q   Okay.  But what I'm asking --
23     **A   I don't know if he wrote that or what.**
24     Q   But what I'm asking is, he informed me that
25 the reason that he wasn't going to renew your permit was

Page 70

1  because of the policy, not because of Nurse Practitioner
2  Wise, at least according to this agreement; is that
3  correct?
4      **A   Yeah.  According to this agreement, yeah.**
5      Q   Let me go back to your timeline.  This is the
6  third page of your timeline.  It says 10/7/22, Lieutenant
7  Piper and CO Mandendorff.
8      **A   Yeah.**
9      Q   Is that M-A-N-D-E-N-D-O-R-F-F?
10     **A   I believe that's the correct spelling, yeah.**
11     Q   "CO Mandendorff said waist chain permit
12 expired, will not use waist chain.  Piper said he talked to
13 NP Luking.  Luking said permit will not be renewed."  And
14 then you put in parenthesis, HIPAA violation.
15         Did I read that correctly?
16     **A   Yeah.**
17     Q   So was this the first time that you were not
18 allowed to have a waist chain at Lawrence?
19     **A   Or front cuffing.**
20     Q   Okay.  But it said waist chain permit expired.
21 So I know that the permit was actually set to expire in
22 August of 2022.  But my question is, from August of 2022
23 until October 7, 2022, were you still getting the waist
24 chain or the front cuffing?
25     **A   I think so.  I have to look on my -- my notes**

Page 71

1  about when I was denied yard because they didn't want to
2  use it.
3      Q   Okay.  But at least according to this
4  timeline, is this the first time that you weren't allowed
5  to use the waist chain or front cuffing?
6      **A   I can't say for sure.  I think this was just**
7  **for a yard incident right here.**
8      Q   So it's possible that earlier than this, you
9  also weren't able to use the waist chains; is that right?
10     **A   Yeah.  The officers, they knew I had a**
11 **disability because it was clear and obvious, so they would**
12 **not cuff me behind my back.**
13     Q   Even if you didn't have the permit, they still
14 would cuff you with a waist chain or a front cuffing?
15     **A   Yeah.  Prior to 2018, it was like that, and**
16 **then sometime that changed where they need a medical**
17 **permit.  But I was there in Lawrence so long, I knew all of**
18 **those officers.  They knew -- I always had a front cuff or**
19 **a waist chain permit.  So whether they knew it expired or**
20 **not, I don't know.  But I was still given it at times until**
21 **I wasn't, for like six months, and then I was just like in**
22 **solitary for six months because I was denied accommodation.**
23     Q   And then the next thing I see, "10/21/22,
24 Lieutenant Piper said my waist chain permit is expired.  I
25 was denied yard.  Could not cuff behind the back."

Page 72

1          So looking at this timeline, are these the
2  only two instances where you weren't allowed to go to yard
3  because of the cuffing or just the two that you wrote down?
4      **A   No.  I have a whole list from August until**
5  **January of when I was transferred into New Mexico and I was**
6  **denied yard based on their refusal to accommodate me.**
7      Q   Have you provided us with that list or those
8  notes?
9      **A   I am not sure.  I'm not sure if you asked me**
10 **for these.  I can recite them right now.**
11     Q   If you could just provide us copies, that will
12 be preferred, so that way, we have a physical copy of it.
13     **A   This was when I was denied law library kiosk,**
14 **denied showers, denied work/job, denied yard.  You didn't**
15 **receive any of this for 2022 or 2023?**
16     Q   I don't have all of it opened right now, but I
17 don't believe so, but I can check when we take a break, and
18 I can talk with Ms. Powell and see if she has a copy of
19 that so we don't have to make you send more copies if you
20 don't need to.
21     **A   Are you able to receive, like, this by e-mail**
22 **or something right now if that's possible?**
23     Q   I don't know if -- I mean, I can, but I don't
24 know if you're able to do that there.  I don't know what
25 the policies are.



Page 73

1    A    I'm told that Ms. Chaloupek can e-mail this to
2    you if you want a copy of this right now.
3         Q    We can do that during a break.  I don't think
4    it's really needed right this minute, but that would be
5    helpful if we could do that.  It probably would save you
6    some time.
7    A    Yeah.
8         Q    Okay.  And then looking at the next note on
9    here, it says you went for your medical writ to get the EMG
10   test; is that correct?
11   A    Yes.
12        Q    And what do you recall about going out for
13   that test?  Were you given the waist chains to travel --
14   A    Yes.
15        Q    -- for the writ?
16   A    Yeah.  I think I was front cuffed to take
17   downstairs to the shower and then I was black box front
18   cuffed in the front to go to the hospital.  That's how that
19   went.
20        Q    In looking at this note underneath, it says,
21   "12/23/2022, saw NP Luking RE EMG test.  Test showed carpal
22   tunnel syndrome.  She said she would call Dr. Myers for
23   wrist braces and waist chain."
24        Did I read that correctly?
25   A    Yes.

Page 74

1         Q    So she explained the EMG test results to you?
2    A    Yeah.
3         Q    And I'm going to go to her note really
4    quickly.  This is -- and of course I don't have the page
5    number.  One second.  Let me stop sharing and I'll pull up
6    the page number really quick.  One second.  Of course it
7    was the next note that I just had to scroll down.
8         Okay.  So I'm showing the witness -- I'm
9    showing the witness a document, Fillmore LCC (MR) 0102.  Is
10   this a note dated 12/23/2022?
11   A    Yeah.
12        Q    Okay.  So it says, "NP note, individual in
13   custody seen today for med furlough follow-up.  Furlough
14   documents thoroughly reviewed and discussed.  Testing
15   revealed, acute, mild bilateral carpal tunnel syndrome.
16   Patient educated on this diagnosis.  Patient requesting
17   wrist braces as treatment.  Advised that per regional
18   medical director, no sleeves/braces were to be issued.
19   Therefore, will refer to on-call M.D. for further
20   evaluation/discussion.  Patient agreeable to this."
21        Did I read that correctly?
22   A    Yeah.
23        Q    Do you recall discussing with her that the
24   braces, she wouldn't be able to provide you braces?
25   A    No, she never said that.  She said would

Page 75

1    talk to Dr. Myers about that and the waist chain renewal.
2         Q    Okay.  She said that she personally would talk
3    to Dr. Myers or she would refer you to speak with him?
4    A    She said she was going to call him.
5         Q    Okay.
6    A    She personally.
7         Q    Excuse me.  And then the plan section it says,
8    "Tylenol, 500 milligrams, one tablet three times a day as
9    needed for 12 months," and then it also says, "Start
10   diclofenac twice a day for 12 months."
11        Do you see that?
12   A    Yeah.
13        Q    Did she talk to you about starting a new
14   medication?
15   A    No.
16        Q    Do you recall ever receiving that medication?
17   A    I am not sure.  I don't think I received
18   anything because I think I wrote a grievance up for that
19   saying that I didn't receive any type of medical treatment
20   after I saw NP Luking.
21        Q    Okay.  And then under the third section on the
22   plans, it says, "Placed on Dr. Myers' line.  Persistently
23   requesting waist chain and wrist braces for carpal tunnel."
24        Did I read that correctly?
25   A    Yeah.

Page 76

1         Q    Are you aware that wrist braces for carpal
2    tunnel syndrome typically include a piece of metal or
3    plastic to stabilize the wrist?
4    A    Yeah.  I have them over here.
5         Q    Do you know if those types of braces are
6    allowed within the IDOC?
7    A    I am sure they are if they are medically
8    required.
9         Q    What kind of facility was Lawrence
10   Correctional Center in 2022 and 2023?  Was it maximum,
11   minimum, medium?
12   A    I have no idea what it was.  It was a prison.
13        Q    I'm aware of that, I just didn't know if you
14   were aware of the level of security.
15   A    It was a medium the last time I was there, but
16   we were considered max because we were in administrative
17   detention, but I don't know.
18        Q    I know that she documented on here, Nurse
19   Practitioner Luking, that she was referring you to
20   Dr. Myers regarding the waist chain, but did you request a
21   waist chain or other cuffing permit from Nurse Practitioner
22   Luking at this time?
23   A    Yes.  Every time I saw somebody, I requested
24   it.
25        Q    And what did she say about it?

Page 77

1    A   That Dr. Myers had to approve it.

2    Q   So she said that she couldn't provide you a

3   permit?

4    A   Correct.

5    Q   And then looking on the left-hand side, it

6   says -- it includes your weight and it says, with chains.

7   Did you have waist chains when you saw the nurses or the

8   nurse practitioners?

9    A   Always.  I was always restrained.  They never

10   physically examined me whatsoever.  None of them.

11    Q   But you did have a waist chain at the time of

12   seeing the nurse practitioners; is that correct?

13    A   Well, they bring everybody down in waist

14   chains to see the nurse.  Nobody is -- Nobody is cuffed

15   behind the back to see a nurse.  They are always waist

16   chains, no matter if they have a permit or not.

17    Q   And then you saw Nurse Practitioner Luking a

18   few times while at Lawrence; is that right?

19    A   Yeah.

20    Q   But you aren't suing her in this case;

21   correct?

22    A   Should I be?  No.  That's correct.

23    Q   That's not my question.  My question is,

24   you're not, to your knowledge; is that correct?

25    A   That's correct.

Page 78

1    Q   Okay.  And then you -- I believe you testified

2   to this earlier, but January 24th, 2023, you left IDOC

3   custody to go to New Mexico; is that right?

4    A   Yes.

5    Q   And at least since you have been in New

6   Mexico, you were no longer under the medical treatment of

7   Dr. Myers or Nurse Practitioner Wise; is that correct?

8    A   I don't know.  It's still Wexford.  They're

9   the provider here in New Mexico.

10    Q   Have you seen Nurse Practitioner Wise or

11   Dr. Myers since you've been in New Mexico?

12    A   No.

13    Q   Do you know, as you sit here today, if they

14   are currently involved in your medical treatment?

15    A   I have no idea.

16    Q   Do you blame Dr. Myers or Nurse Practitioner

17   Wise for anything that happened after you left Illinois to

18   go to New Mexico?

19    A   No.

20    Q   I missed that answer.  What did you say?

21    A   No.

22    Q   Okay.  I'm wrapping up here.  We just have a

23   few more questions for you and then we can probably take a

24   break and then let Ms. Powell go.

25        Generally, why did you decide to bring this

Page 79

1   lawsuit?

2    A   Because I was denied accommodation for my

3   disability, and I was segregated to my cell for at least

4   six months where I couldn't go to the yard or the shower or

5   the library kiosk or get a flu shot or whatever else.

6    Q   Are you claiming any economic losses, like

7   loss of property, loss of wages?

8    A   No.

9    Q   Are you claiming any emotional distress

10   damages?

11    A   If it's not written in the complaint, then no.

12    Q   Have you ever seen a psychiatrist or mental

13   health professional while at Lawrence?

14    A   Probably walking around or something.  I don't

15   know.

16    Q   But were you ever evaluated by them formally?

17    A   They used to come around once a week and just

18   ask standard questions, but I have never been treated or

19   any of that by mental health, no.

20    Q   So you were never on the mental health

21   caseload?

22    A   No.  Never.

23    Q   Okay.  Are you claiming any other injuries

24   that we have not discussed today?

25    A   No.  None other than what's in the complaint

Page 80

1   and what we talked about today, being denied accommodation

2   for activities and programs and services.

3    Q   And I'm not going to go through all the

4   records again, but we looked through most of your records

5   and I didn't see anything at Lawrence that discussed your

6   shoulder.  It seemed to be all about your wrist and your

7   arm, your left arm.  Would you agree that there really

8   wasn't much discussed regarding your right shoulder while

9   at Lawrence?

10    A   I believe that's -- I believe that's correct.

11   It was only in Tamms where I had that injury and I have had

12   it since.  I was diagnosed with arthritis in June of 2009

13   in Tamms.

14    Q   Have you received any bills for your medical

15   treatment, any requests for payment?

16    A   No.  I'm in prison.  They're mandated to take

17   care of me.

18    Q   I understand that, but sometimes people, they

19   go off to a doctor, a hospital and then they get a bill,

20   and I just have to -- I mean, I think it's usually taken

21   care of.

22    A   Right.

23    Q   But I just have to ask.  And then in your

24   answer to Defendants' Interrogatory No. 6, you claim

25   compensatory and -- Here.  Hold on.  You claim damages of

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

Page 81

1  $40,000 against each defendant; is that right?

2    A    That sounds correct.  No. 6, you say?

3    Q    No. 6, yes.

4    A    Yeah.  That's correct.

5    Q    Has your request for relief changed since you

6  sent us this answer?

7    A    Not unless you want to settle.

8    Q    Okay.  Hold on one second.  And then looking

9  at your complaint, it looks like you also request a

10  permanent injunction regarding enjoining defendants from

11  rear cuffing plaintiff.  Is it your understanding that

12  you're still in IDOC custody, just at New Mexico?

13    A    That's correct.  I'm still an Illinois inmate.

14    Q    So your request for an injunctive relief is

15  still active, I guess, in this case?

16    A    Well, it was denied as moot because I was

17  given all that over here by medical, a Wexford provider.

18    Q    Okay.

19    A    So that.

20    Q    In the event that you go back to IDOC, are you

21  still requesting -- that you go back to Illinois, are you

22  requesting the injunction still?

23    A    Oh, yeah.  It would be refiled for sure.

24    Q    Okay.  Is there anything else that you feel is

25  relevant to your allegations that you've brought against

Page 82

1  Nurse Practitioner Wise and Dr. Myers that we haven't

2  already discussed today?

3    A    Not that I can recall, no.

4    Q    Okay.

5        MS. MATUSOFSKY:  I don't have any further

6  questions for now.  I might have some follow-up questions

7  after Ms. Powell goes.  But we've been going for about two

8  hours.  Does everyone want to take a quick break?

9        (Whereupon, a short break was taken.)

10            EXAMINATION

11  QUESTIONS BY MS. POWELL:

12    Q    So we're back on the record.  And,

13  Mr. Fillmore, you understand that you are back under oath

14  as you previously were?

15    A    Yes.

16    Q    Okay.  I told you that I was going to organize

17  my notes to try to streamline everything.  Notoriously, I

18  will mess up somewhere and we will bounce around, but I

19  will do my best to stay in order as much as possible.  I

20  want to briefly go back.

21        We talked about at the beginning lawsuits that

22  you had filed in Sangamon County, and then you also

23  referenced lawsuits that you had filed in federal court

24  that were closed; is that correct?

25    A    Yes.

Page 83

1    Q    Of any of those lawsuits, any of the prior

2  lawsuits that you have filed, were any of these claims a

3  violation of your rights under the Americans With

4  Disabilities Act or the Rehabilitation Act?

5    A    No.

6    Q    Okay.

7    A    I never had that issue until now, well, at

8  Lawrence.

9    Q    Okay.  And I won't pull them up unless you

10  need me to, in which case I'm probably going to ask Alison

11  to pull them up because she's got them pulled, but we

12  shouldn't need to.

13        I want to go back through some of the timeline

14  of when you saw the medical providers and just ask you a

15  few ancillary questions, okay, specifically starting with

16  the May 20th, 2022 visit that you had with NP Wise.  Do you

17  recall talking about that?

18    A    Yeah.

19    Q    Okay.  And I believe that was the first time

20  that we looked at a record that said you did not qualify

21  for a waist chain permit; is that accurate?

22    A    I believe so.

23    Q    Okay.  But your current permit that you had

24  was good through August of 2022; is that correct?

25    A    Yeah.

Page 84

1    Q    Did you continue to have a waist chain used

2  until August of 2022 when that permit expired?

3    A    Yes.

4    Q    Okay.  Can you tell me, with regards to IDOC

5  and your time in the Illinois institutions, is there a

6  difference between a waist chain permit and a front cuff

7  permit, to your knowledge?

8    A    Yeah.  A front cuff can be just one pair of

9  cuffs on in front of you.  Waist chain, they put a chain

10  around you and you're cuffed at your sides.

11    Q    Okay.  And understanding that you don't have

12  any medical training, do you know the difference between

13  when each of those was typically utilized?

14    A    What do you mean?  Independent of the

15  situation, any officer can cuff you whenever, however they

16  wanted to, I would guess.

17    Q    Okay.  Let me rephrase my question then.

18  Well, let me ask this first:  During your time in the

19  Illinois Department of Corrections prior to 2022, okay, can

20  you tell me what permits you had at any point in time?

21    A    I believe, starting in January of 2018,

22  something had changed within IDOC where medical permits

23  were required for alternative cuffing, so now -- and they

24  only issue either for six months or a year, nothing beyond

25  that.  That's my understanding.

888-893-3767          Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitalegal.com                California Firm Registration #179

LEXITAS

Page 85

1    Q   Okay.  And did you ever have a front cuff
2  permit during that time?
3    A   Yeah.  That was my first one that was issued
4  to me was the front cuff, I think in January of 2018, I
5  believe.  It was attached to an exhibit or the complaint.
6    Q   And then at that time, you only had a front
7  cuff permit; is that correct?
8    A   Either front cuff or waist chain.
9    Q   So that's, I think -- I'm sorry.  I'm not
10  trying to interrupt you.  That's the distinction that I'm
11  trying to make here is whether or not you had a front cuff
12  permit, a waist chain permit or both.
13    A   I had them both at different times, front cuff
14  at first until security staff complained that guys
15  shouldn't be cuffed in the front, so then I went to waist
16  chain.
17    Q   And when did you go to waist chains?
18    A   I can't remember, but whatever is documented
19  on my medical permits.
20    Q   Do you know who complained that individuals in
21  custody shouldn't be cuffed in the front?
22    A   I would hear officers complain all the time.
23    Q   Do you know why they were complaining?
24    A   Because they liked to complain about security
25  stuff all the time.

Page 86

1    Q   Do you have any knowledge as to their specific
2  complaints or concerns regarding the front cuffs, though?
3    A   I think, like, if a mentally ill guy would be
4  cuffed in front, they'd punch the officer or something like
5  that.  That was their concern.  But there was never a
6  security concern whatsoever with me the entire years and
7  years and years of having medical permits.
8    Q   And then you might have already described
9  this, but the waist chain then is a chain that goes around
10  your waist.  And does it go between your legs as well?
11    A   No, just around your waist.
12    Q   Okay.
13    A   And then there's a chain around your waist and
14  tightened with a padlock.
15    Q   I'm sorry.  Say that again.  I interrupted
16  you.
17    A   There's a chain around your waist, and it's
18  tightened with a padlock and then it's just handcuffed on
19  the sides so your hands are at your sides.
20    Q   Okay.  And that's just standard handcuffs on
21  the side of that waist chain?
22    A   Yes.
23    Q   We looked at a medical record from June 10th
24  of 2022 when you were prescribed Mobic for pain.  Do you
25  recall that?

Page 87

1    A   Probably.
2    Q   Okay.  And I believe you testified that after
3  talking with security staff and the sergeant, you think
4  Lieutenant Piper called you and you got the Mobic days later;
5  is that correct?
6    A   Yeah.  I had complained to get medical
7  treatment from medical staff because I wasn't receiving
8  anything.
9    Q   Okay.  So when you complained to security
10  staff, they followed up with medical staff to try to
11  address your issues?
12    A   Yeah.  Because they came back and reported to
13  me what Wise said or somebody else said, so ...
14    Q   Okay.  And you have that noted on your
15  timeline a couple of times, that you talked with security
16  staff or specifically Lieutenant Piper about medical
17  treatment and he would report back what NP Wise dictated to
18  him; is that correct?
19    A   Yes.
20    Q   And then we looked at a record from July 25th,
21  2022, which was a lab/radiology note that again indicated
22  that you did not medically qualify for a waist chain
23  permit; is that correct?
24    A   That was based on her chart review without
25  even examining me or anything, yeah.

Page 88

1    Q   Okay.  And the July 31st, 2022 grievance that
2  you filed, the response from HCUA Cunningham was that
3  individual does not qualify for a waist chain permit and
4  has been medically examined for ADA needs; is that correct?
5    A   That's what it said, but I was never examined
6  for ADA accommodations ever.
7    Q   You're saying that you were never evaluated by
8  or examined by a medical provider ever to determine if you
9  needed ADA permits?
10    A   ADA?  Not after my permit was expired, no.  I
11  kept complaining and writing grievances, but they said I
12  didn't qualify based on chart reviews.  They never
13  physically examined me.
14    Q   This response was to a July 31st, 2022
15  grievance, and that was before the permit expired; correct?
16    A   Yeah.
17    Q   Okay.  So when the issue was raised to the ADA
18  coordinator, Ms. Cunningham, she looked into the matter and
19  reviewed your medical chart; correct?
20    A   I don't know.
21    Q   Okay.  At least based on her response, that's
22  what it indicates; correct?
23    A   That's what's written, yeah.  I don't know
24  what she did.  She never examined me.
25    Q   Did you ever receive hands-on medical

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitaslegal.com                                    California Firm Registration #179

LEXITAS

Page 89

1  treatment from Ms. Cunningham?

2      A   Never.

3      Q   Okay.  Do you know if she ever provided any

4  hands-on medical treatment to any individual in custody?

5      A   I don't know.

6      Q   Okay.  I want to talk about the August 20th,

7  2022 visit with Dr. Myers, and I believe this is when you

8  testified that he pointed to a policy on the wall; is that

9  correct?

10     A   Yeah.

11     Q   Okay.  And your previous testimony was that it

12 had IDOC letterhead, it was on IDOC letterhead; is that

13 correct?

14     A   Yeah.  It was printed.

15     Q   Okay.  Were you able to personally see that

16 policy that he pointed to?

17     A   Yeah.  I read it.  It was like three

18 paragraphs with no signature with the IDOC letterhead on

19 the top just taped to the wall.

20     Q   Did it indicate who that policy came from?

21     A   No.  I requested it through discovery, and you

22 said you were going to provide it, but I'm still waiting.

23     Q   And I'm trying to identify what policy you're

24 referring to, and that's part of this line of questioning.

25 You said that you read it.  Can you tell me, to the best of

Page 90

1  your recollection, what that policy said?

2      A   It was basically like three paragraphs,

3  mandating that front cuffing and waist chains would not be

4  provided for max individual people in custody no matter

5  disability, under ADA.  They talked about all of that

6  stuff, so I was amazed that it was even written like that.

7      Q   Okay.  So you said it talked about all of that

8  stuff.  What else did it say in that policy that was on the

9  wall?

10     A   Just about there's no more alternative

11 cuffing, front cuffing or waist chain.  I'm pretty sure it

12 was three paragraphs of different things.  It was taped on

13 the right-hand side of the wall or the left-hand side if

14 you walk in, the right-hand side where I was sitting.

15     Q   I'm going to share my screen real quick, and

16 I'll tell you that the majority of the contents of the

17 document doesn't matter.  I just want to confirm a few

18 things that I think I already know the answer to.

19 This is an Illinois Department -- Sorry.

20 Do you see that document now?

21     A   Yeah.

22     Q   Okay.  So this is an Illinois Department of

23 Corrections administrative directive.  Is this what the

24 document looked like?

25     A   No.  It had the IDOC letterhead and then it

Page 91

1  just went into three paragraphs.  No signatures.  It

2  doesn't say like -- I can't remember if it was directed to

3  staff or regarding inmates, but it wasn't a directive like

4  this, no.  It was like a letter that was typed.

5      Q   And just to clarify again, I think I know the

6  answer to this, but this is -- the document that I'm now

7  showing you, do you see a different document?

8      A   Yeah.  This is not it.

9      Q   So this is an Illinois Department of

10 Corrections institutional directive for Lawrence

11 Correctional Center.  Is that what the document looked

12 like?

13     A   No.

14     Q   Okay.  So what you're referring to just is

15 like standard letterhead for the Illinois Department of

16 Corrections?

17     A   Correct.

18     Q   Did you ever receive -- Have you ever received

19 any other documents that were on that letterhead?

20     A   Yeah.  Almost all IDOC documents are like

21 that.  Like memos, when they pass out memos or bulletins,

22 it was in that format.

23     Q   One second.

24     A   It was written Illinois Department of

25 Corrections on the left-hand side on the top of the page.

Page 92

1      Q   Let me share one more time.

2      A   No, not like that.

3      Q   Do you see that document now?

4      A   It wasn't like that.

5      Q   Okay.  So this is --

6      A   That's an ARB response.

7      Q   This is an ARB response so it didn't look like

8  that letterhead?

9      A   No.  I'm going to see if I can find one real

10 quick if I have one in my paperwork.

11     Q   I'm going to share my screen one more time

12 with you.

13     A   Have you ever seen like an IDOC memo or a

14 bulletin or a warden's bulletin?

15     Q   So this document that I'm showing you now is

16 Bates 000097.  Did it look like that document?

17     A   No.  It was like -- it's like one of the

18 standard Illinois Department of Corrections signs like on

19 their letters when you receive mail.  It's on the top

20 left-hand page of the paper.

21     Q   Just one moment.

22     A   Yeah.  I don't have a copy of it as an example

23 to show you.

24     Q   Okay.  I'll keep looking for one, but we can

25 also move on.  If you do have an example in any of your



Page 93

1  records anywhere, if you could send that to me, that would
2  be appreciated.  Okay?
3      So the August 20th, 2022 visit with Dr. Myers
4  was the first time that that policy was referenced with
5  regards to nonrenewal of your waist chain permit; is that
6  correct?
7      A   Yeah.  That's the first time I ever saw it or
8  heard about it.
9      Q   But prior to that, you had been told that you
10  medically did not qualify for a waist chain permit anymore;
11  is that correct?
12     A   Prior to that, I was told that I always did
13  and I always received one until I was sent back to
14  Lawrence, and Wise and Myers, for whatever reason,
15  deliberately indifferent to my medical needs, said I didn't
16  qualify.
17     Q   So I don't want generalized statements of your
18  claim and things of that nature.  I'm trying to
19  specifically talk about -- You said August 20th, 2022 was
20  the first time that this policy was referenced; is that
21  correct?
22     A   Yes.
23     Q   And prior to that, we just talked about times
24  in May and July when you were told that you medically did
25  not qualify for the waist chain permit any longer; is that

Page 94

1  correct?
2      A   Per Wise, yes.
3      Q   But that's what you were told?
4      A   Yeah.
5      Q   At one point you testified that you were still
6  given the waist chain permit for six months until you
7  weren't any longer.  Do you remember saying that?
8      A   Yeah.  Either after six months or a year when
9  it expired, we have to renew it.
10     Q   Okay.  Okay.  So you were just talking about
11  the renewal process, you weren't talking about -- I'll tell
12  you what I took that statement to mean, and you tell me if
13  I'm correct or not, that after the permit expired, you
14  still received it for six more months until you weren't.
15  That's not what you were saying?
16     A   No.
17     Q   Okay.  So you're saying the six-month period
18  was for each permit and you continued to get a renewed
19  permit until you didn't?
20     A   Correct.
21     Q   Okay.  So I'm looking at the list that you
22  just provided to us on the break of when you were denied an
23  accommodation.  Do you have that in front of you?
24     A   Yes.
25     Q   On there, it says on there, "Denied medical

Page 95

1  treatment.  Flu shot 10/25."
2      You testified previously that when you were
3  taken to medical that everyone was placed in waist chains;
4  is that correct?
5      A   Yeah.  This date, they just wanted to cuff us
6  up behind the back and just step right outside of our cells
7  so they could give us a shot right there instead of taking
8  us downstairs.
9      Q   Okay.  And so for these situations where you
10  say you were denied an accommodation, were each of these
11  things offered to you?  For example, were you offered a flu
12  shot?  Were you offered to go to the law library kiosk?
13  Were you offered a shower?
14     A   Yeah.  But I couldn't because I couldn't be
15  cuffed behind my back.
16     Q   Okay.  So tell me about that exchange as to
17  what that exchange looks like with the officer.
18     A   Every time I requested to go to the law
19  library kiosk, they would require me to be cuffed behind my
20  back.  So every time I would request it, they would demand
21  that I would be cuffed behind my back, which I couldn't.
22  So then I was denied the library kiosk.  Shower, if I
23  wanted to go to the shower, if they wanted to cuff me
24  behind my back I couldn't go because I couldn't be cuffed
25  behind the back, so I was denied a shower.  The same for a

Page 96

1  porter job and the same for yard.  Yard was twice a week.
2      Q   Yard was twice a week, you said?
3      A   Yes.
4      Q   So when they told you -- they would come to
5  your cell, tell you that you need to cuff up behind your
6  back, and then did you refuse to cuff up behind your back
7  because you said you couldn't?
8      A   Yeah.  I couldn't, so I was denied that
9  program, so ...
10     Q   Okay.  But I'm, again, talking very
11  specifically just about that interaction.  So they would
12  come to your cell because you requested to go to the law
13  library kiosk, for example, and they would tell you to cuff
14  up behind your back.  And then what is your response to
15  them to that request?
16     A   I couldn't because I had injury and a
17  disability and it caused serious tormenting pain if I was
18  cuffed behind my back and caused me further injury.
19     Q   Were those instances ever documented, to your
20  knowledge, that you were denied?
21     A   A movement sheet on the days that I missed
22  shower or the days that I missed yard, all of that should
23  be documented somewhere if they completed it.
24     Q   Okay.
25     A   Sometimes they don't.  It really happened, but



Aaron Fillmore                                                                March 26, 2024

1  it would be on there, if anywhere.

2      Q    Were you ever issued a disciplinary ticket for

3  failure to -- or disobeying a direct command with -- Let me

4  strike that.

5          Were you ever issued a disciplinary ticket for

6  failure -- Man, words are difficult for me today. I

7  apologize. Let me start over. Were you ever issued a

8  disciplinary ticket for disobeying a direct command for

9  refusing to cuff up behind your back?

10     **A    No.**

11     Q    Okay. So is it your testimony that from

12  August, it looks like 21st was the first time through the

13  January 22nd, that you did not take a shower during that

14  entire time?

15     **A    Well, some days I would work and they would**

16  **just open my door. I wouldn't have to be cuffed even**

17  **though that's what they were supposed to do. But they**

18  **didn't do that. Each day that's on here, I was denied**

19  **either a shower, work, yard or law library kiosk because it**

20  **was mandated that I cuff behind my back. The days not**

21  **documented are days I probably went to the shower that I**

22  **worked and they opened the door without using cuffs at all.**

23     Q    Okay. So you testified that you were offered

24  a shower every day; correct?

25     **A    Yeah.**

1      Q    So the dates that are not listed on here, you

2  did go to the shower; correct?

3      **A    Yeah. With no cuffs.**

4      Q    Okay. So let's go -- So on the column that

5  says denied law library kiosk, you simply note on there

6  that you went to the kiosk on 9/2.

7      **A    I was given a waist chain.**

8      Q    I'm sorry?

9      **A    I was given a waist chain on 9/2.**

10     Q    You were given a waist chain on 9/2?

11     **A    Yeah.**

12     Q    And then again, it indicates on the next page

13  that you went to the law library kiosk on 1/18/23. How did

14  you go to the law library kiosk that day?

15     **A    Waist chain. If I went there, it was waist**

16  **chain.**

17     Q    I'm sorry. Can you repeat that statement?

18     **A    Anytime I went to law library kiosk those days**

19  **was by waist chain.**

20     Q    And was there something special about those

21  days that they offered the waist chain versus the other

22  days where they required you to be cuffed behind your back?

23     **A    It was probably an officer who knew me and**

24  **knew I wasn't a problem child.**

25     Q    Okay. Moving to the job work column, how

1  frequently did you -- Strike that. Moving to the job work

2  column, how frequently were you supposed to go to work?

3      **A    Every day.**

4      Q    Okay. So is this the same as the shower is

5  that if the date is not listed on that column, that you

6  did, in fact, go to your job?

7      **A    Yes. No cuffs at all. They just opened**

8  **the door or they waist chained me and took me downstairs or**

9  **front cuffed, one of those three. That's the only way that**

10  **I could come out of the cell.**

11     Q    Was either no cuffs, a front cuff or a waist

12  chain?

13     **A    Yeah.**

14     Q    Were you ever disciplined for not reporting to

15  your job?

16     **A    No. Another worker took over that day.**

17     Q    Okay. And we probably talked about this.

18  What was your assignment at that time, your job assignment?

19     **A    Pod porter.**

20     Q    Say that again.

21     **A    A pod porter.**

22     Q    Okay. And is that the same thing as like a

23  janitor? Is that how it's listed on your assignment sheet?

24     **A    Yeah. Just sweep, mop, pass phones, clean,**

25  **sweep, mop.**

1      Q    Moving to the yard column. You've got dates

2  listed on there. Were there any times during that period

3  of time that you did go to yard?

4      **A    No. I was denied twice a week for however**

5  **long this was, months and months.**

6      Q    Okay. So is it your testimony that from

7  August 27th until --

8      **A    I was transferred to New Mexico. I did not go**

9  **to yard.**

10     Q    Were you offered yard?

11     **A    Yeah.**

12     Q    And then denied yard when you refused to cuff

13  up behind your back?

14     **A    Yeah. I wasn't provided accommodation to be**

15  **waist-chained, so I missed that program.**

16     Q    Okay. That wasn't my question, though. Did

17  you tell them that you were not cuffing up behind your back

18  and then you were denied yard?

19     **A    Yes. And I gave them reasons why, medical**

20  **issues, that they already knew.**

21     Q    You briefly talked about having permits in New

22  Mexico. When did you get those permits?

23     **A    The day I got here, January 24, 2023.**

24     Q    And what permits -- Do you still have all of

25  those same permits today?

888-893-3767                    Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
www.lexitalegal.com                                  California Firm Registration #179

LEXITAS

Page 101

1    A    Sure do.

2    Q    What permits do you have currently in New

3  Mexico?

4    A    I have a permit for wrist bracelets, for front

5  cuffing or no cuffing behind of the back because of left

6  arm injury and shoulder injury, and a therapy hand ball for

7  my carpal tunnel.

8    Q    Okay.  I'm sorry.  It cut out on my end.  I

9  think I got a notification.  So tell me the first one that

10  you said again.

11    A    Permit for front cuffing, for a left arm

12  injury, for shoulder injury.

13    Q    Okay.  So -- so the front cuff permit that you

14  have in New Mexico is for the shoulder injury; correct?

15  Not for the wrist, the right wrist?

16    A    I have one for both.

17    Q    Do you have a copy of those medical permits

18  that you have in New Mexico?

19    A    Sure do.

20    Q    Have those previously been provided?

21    A    I sent them to Alison.

22    Q    Okay.  And she forwarded me those responses.

23  Just as an aside, if you provide any documentation to

24  Ms. Matusofsky, that should also be sent to me as well.

25  Okay?

Page 102

1    A    So left arm injury was dated January 24, 2023

2  permit.  The shoulder injury or shoulder problem was dated

3  February 2nd, 2023.

4    Q    So none of those permits reference your right

5  wrist; correct?

6    A    I don't have a right wrist injury.  I have a

7  left wrist injury, compound fracture.  I have carpal tunnel

8  in both.

9    Q    You previously testified that you were

10  segregated to your cell for at least six months because you

11  couldn't go to the yard, shower or law library kiosk, but

12  you just testified about times when you were provided

13  those -- those programs; correct?

14    A    When I wasn't required behind my back, yeah.

15    Q    So during that six-month period, you did

16  attend each of those programs on several occasions;

17  correct?

18    A    I would -- No, I was denied like 99 percent of

19  the time.  Yard, I was denied a hundred percent of the

20  time.

21    Q    Say that again.

22    A    Yard I was denied a hundred percent of the

23  time.

24    Q    Okay.  Aside from those times or categories

25  that are listed on your sheet that you sent us with the

Page 103

1  dates listed, were there any other activities or programs

2  that you went to at any point in time during the time

3  period of August to January?

4    A    No.

5    Q    Okay.  Did you ever go to religious services

6  during that time?

7    A    There are no religious services, no.

8    Q    Did you ever go to any, like, education groups

9  or programs?

10    A    No, they didn't have any of that.

11    Q    Okay.  So you weren't signed up for either

12  religious services or any kind of education program?

13    A    There was no ability for me to sign up because

14  there was none available at all.

15    Q    Okay.  And I'm not -- my question is just

16  trying to determine if -- in your mind if you were denied

17  those accommodations because of the disability or if you --

18    A    No.

19    Q    -- they weren't offered?

20    A    No.  Not those, no.

21    Q    We talked about how you're currently housed in

22  New Mexico and you weren't told why.  Do you know if you'll

23  ever be returned to the custody of the Illinois Department

24  of Corrections to an Illinois facility?

25    A    I am subject to it every day.  I don't know,

Page 104

1  but I'll probably be here until my parole.

2    Q    And that was going to be my next question.  Do

3  you know what your current outdate is?

4    A    August of 2033.

5    Q    2033, you said?

6    A    Yeah.

7    Q    Okay.  And the crime for which you are

8  currently incarcerated, what county did that occur out of?

9    A    DeKalb County.

10    Q    At the beginning of your testimony, you went

11  over your history of incarceration with Ms. Matusofsky.  Do

12  you remember that?

13    A    Probably.

14    Q    Okay.  So when you talked about the different

15  times that you were at the different facilities?

16    A    Yeah.

17    Q    Do you know why you were transferred from

18  Pontiac back to Lawrence in 2022?

19    A    Because IDOC director no longer housed

20  administrative detention inmates at Pontiac.  They are only

21  going to be housed in Lawrence and Menard, so me and a

22  hundred others got sent there.

23    Q    Do you know why you were transferred to

24  Pontiac from Lawrence in 2020?

25    A    No.



Page 105

1    Q    Were they administrative transfers or
2    disciplinary transfers, do you know?
3    **A    Administrative.**
4    Q    Okay.  You testified previously that -- I
5    think you said administrative detention and segregation are
6    the same thing.  Do you mean that in terms of -- Well,
7    strike that.  What do you mean by that?
8    **A    As far as conditions of confinement, you're in**
9    **solitary, you have to be handcuffed or shackled when you**
10   **leave your cell.  There are no programs.  You go to, like,**
11   **little dog cages for a yard.  They are basically the same.**
12   **The only difference is administrative detention, you're**
13   **allowed, like, to go to commissary, general population,**
14   **showers, and you get, like, more personal time.  You're in**
15   **solitary 24 hours a day.**
16   Q    Do you know why you were placed in
17   administrative detention?
18   **A    Reasons varied over the years, I would assume.**
19   **I would assume it was from 1998 all the way until I came to**
20   **New Mexico, 25 years of solitary.**
21   Q    But what I'm asking, do you know the reasons
22   that you were placed in administrative detention?
23   **A    I don't know.  They don't tell you.  It's just**
24   **discretionary.  It's arbitrary.**
25   MS. POWELL:  I don't think that I have any

Page 106

1    further questions at this time.
2    Alison, do you have any follow-up?
3    EXAMINATION
4    QUESTIONS BY MS. MATUSOFSKY:
5    Q    Yeah.  I just -- We've talked quite a bit
6    about cuffing, and in your complaint you say that cuffing
7    behind your back does not serve any penological purpose.
8    **A    Yeah.**
9    Q    I don't believe we've discussed your
10   disciplinary history in detail.  In looking at your
11   disciplinary records, it looks like in December of 1998 you
12   were found guilty of assaulting an officer with -- by
13   stabbing them with a homemade weapon; is that correct?
14   **A    Yeah.**
15   Q    So I know that you do not believe that there's
16   any penological purpose for you being cuffed behind your
17   back, but would you agree that there is some risk with
18   individuals in custody who have a history of stabbing
19   officers to be cuffed in the front or on waist chains?
20   **A    Well, to clarify, the penological interest is**
21   **about being subject to tormenting pain on being cuffed**
22   **behind the back.**
23   Q    Okay.  But would you agree that there is a
24   security purpose to have individuals in custody, especially
25   those with a history of attacking officers, to be cuffed

Page 107

1    behind their back rather than front cuff or waist chain
2    permits or waist chain cuffing?
3    **A    Yes.  But not me.**
4    Q    Because of your specific physical condition?
5    **A    Disability, yeah.**
6    Q    Okay.  And just to clarify, in 1998, that was
7    after you had broken your wrist in 1982; is that correct?
8    **A    Yes.**
9    Q    And in December of 1998, did you already have
10   the right shoulder injury as well?
11   **A    Yeah.  That happened when they beat and**
12   **tortured me on February 4, 1997 in Menard over the Page**
13   **case.**
14   Q    So your physical condition regarding cuffing
15   is the same now as it was in 1998; is that correct?
16   **A    As far as what?  Protocol for a waist chain?**
17   Q    Requesting that because of your physical
18   condition; is that correct?
19   **A    I didn't need it then.  I wasn't cuffed or --**
20   **I didn't need -- It wasn't required that I needed a medical**
21   **permit to be alternative cuffed either in the front or**
22   **waist chain prior to.**
23   Q    And my question is just regarding your
24   physical condition.  Your physical condition is the same or
25   similar today as it was in 1998 regarding your left

Page 108

1    wrist/arm and your right shoulder?
2    **A    No.  No, it's worse.**
3    Q    It's worse now?
4    **A    Yes.  As soon as I started complaining about**
5    **numbness and pain in my left wrist and hand, that's when**
6    **they decided to not renew my medical permit.  It was only**
7    **after my complaints.  But until then, in years prior, I got**
8    **it every six months or every year.**
9    Q    Okay.  But specific to 1998, at least you
10   still -- you had an existing injury to both your right
11   shoulder and your left wrist at the time of being found
12   guilty of stabbing an officer?
13   **A    Yes.**
14   Q    Okay.  And then specific to the claims brought
15   in this case, I just have a few more questions.  You said
16   that Nurse Practitioner Wise discussed your grievance when
17   you saw her in the yard on July 22nd, 2022; is that
18   correct?
19   **A    Not the yard, but I came in 30 minutes later**
20   **at 10:30.**
21   Q    So when you saw her in the AD building at
22   10:30 on that date, she talked to you about your grievance?
23   **A    Yeah.  She said she would -- either she**
24   **received them or was aware of my grievances.**
25   Q    Okay.  Did she tell you that she was denying

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Aaron Fillmore                                                                    March 26, 2024

1  your permit because you filed grievances?

2      **A   No.**

3      Q    And what was the reasoning that she gave you

4  for denying your permit?

5      **A   Based on chart review, I no longer qualified.**

6      Q    So based on her review of your medical file

7  and your evaluation, she determined you no longer

8  qualified?

9      **A   Correct.  After her, I made complaints, and**

10  **now all of a sudden, I don't get treatment.**

11      Q    And then when you saw Nurse Practitioner

12  Luking in December of 2022, did you ask her for different

13  pain medications besides the Mobic?

14      **A   I don't remember.**

15      MS. MATUSOFSKY:  That might be all I have, but

16  could we take a five-minute break just so we can both go

17  through our notes and make sure there's nothing else that

18  we are missing?

19      **THE WITNESS:  All right.**

20      MS. MATUSOFSKY:  So it's 1:05 here.  I don't

21  know what time it is for you there.  Is it 11:05?

22      **THE WITNESS:  12:00.**

23      MS. MATUSOFSKY:  Okay.  I kept thinking you're

24  two hours apart, but we're only one hour.  So we'll be back

25  in five.

1      (Whereupon, a short break was taken.)

2      Q    (By Ms. Matusofsky) I just have a very brief

3  question for you.  You testified earlier that you were a

4  shower porter at Lawrence from only a couple of months,

5  from November of 2022 until January of 2023; is that right?

6      **A   I believe so.  It could have been earlier.**

7      Q    Okay.  In the documents that you had scanned

8  and sent to us today, you listed dates as early as August

9  of -- August 17, 2022 where you were unable to go to your

10  job.

11      **A   Okay.  Yes.  That's when it started then.**

12      Q    So you would have been -- You would have

13  started your job sometime around August of 2022 then?

14      **A   Yeah.  Yeah.  That would be right.**

15      Q    Okay.  I think that was all I had.

16      **A   There should be a form in placement in the**

17  **record somewhere that gives that exact date, but I don't**

18  **think I know it or have it.**

19      Q    Okay.  There might be -- Let me look real

20  quick.  It might be in this document, but I could be

21  thinking of something else.  It's hard to look at some of

22  these -- it's like in a spreadsheet, but they are printed

23  on multiple pages, so it's hard if it's not all printed in

24  front of you to line it all up, but --

25      MS. POWELL:  The Bates is 327.

1      MS. MATUSOFSKY:  Yeah.  I'm trying to look

2  through that and it's hard because they are on different

3  pages.

4      Q    (By Ms. Matusofsky) So It looks like January

5  at Lawrence from -- It looks like it says from April 12,

6  2022 until your transfer.

7      **A   For janitor?**

8      Q    Oh, actually, no.  It looks like also

9  administrative detention is also on this list.  So hold on

10  one second.  Sorry.  It looks like it's July 12, 2022 until

11  you're transferred.  Does that sound about right?

12      **A   It could be.  I didn't think it was that long.**

13      Q    Okay.  Just approximate time frame, sometime

14  in the late summer/fall through your transfer?

15      **A   Yeah.**

16      Q    Okay.

17      MS. MATUSOFSKY:  I think that's all I have.

18  Go ahead, Jen.

19             EXAMINATION

20  QUESTIONS BY MS. POWELL:

21      Q    Mr. Fillmore, on that grievance that you just

22  referenced, the July 25, 2022 grievance, you said that was

23  against NP Wise; correct?

24      **A   It was in regards to staff conduct,**

25  **retaliation, for indifference, medical treatment --**

1      (Reporter asked for clarification.)

2      **A   It's about staff conduct, medical treatment,**

3  **ADA disability accommodations are all circled on the**

4  **grievance, and then "other" is marked, retaliation and**

5  **deliberate indifference to serious medical needs, and it's**

6  **against Nurse Practitioner M. Wise.**

7      Q    (By Ms. Powell) And you said on the bottom

8  there it's marked not an emergency by the warden?

9      **A   Yeah.  Somehow she got it and marked on here,**

10  **but it was never marked emergency by my name.**

11      Q    Okay.

12      **A   So I don't know.  And it's Grievance**

13  **No. 07-22-235.  It was received by the grievance office**

14  **July 27, 2022.**

15      Q    And what's the date on the signature from the

16  warden deeming it not an emergency?

17      **A   28th, July 28th.**

18      Q    Okay.  So after you received that back from

19  the warden marked as a nonemergency, did you resubmit it

20  through the normal channels of the grievance process?

21      **A   Yeah.  I would have sent it to the grievance**

22  **officer.**

23      Q    When did you resubmit that to the grievance

24  officer?

25      **A   The day I got it back from the warden saying**



Page 113

1  it was nonemergency. It shouldn't have been processed that
2  way. It was wrong. So I don't know if I got it back that
3  way or what because somebody circled nonemergency by my
4  name, and I don't think I did that.
5      Q   And your resubmission of that grievance after
6  it was deemed a nonemergency, that was not listed on your
7  timeline that you provided; correct?
8          MS. MATUSOFSKY: I can pull it up for you if
9  you need to see it quickly.
10     A   If you say it's not on there, then it's
11  probably not on there. I don't know.
12         MS. MATUSOFSKY: Do you want me to pull up
13  that page, Jennifer?
14         MS. POWELL: No.
15         MS. MATUSOFSKY: Okay.
16     A   Yeah. 7/25/22 wrote grievance against Wise.
17     Q   (By Ms. Powell) Right. And you said that it
18  was the day that you originally submitted it. But my
19  question is, is it on there -- After you received it back
20  from the warden on July 28, 2022, you said you resubmitted
21  it and that is not listed on your timeline; correct?
22     A   Correct.
23     Q   During your time in the custody of the
24  Illinois Department of Corrections at an Illinois facility,
25  were you ever issued a double cuff permit?

Page 114

1      A   No.
2      Q   Have you ever requested a double cuff permit?
3      A   Yeah. They said that was against policy or
4  something. That's why they only did front cuff or waist
5  chain, and then it just went to solely waist chain.
6      Q   When did you request a double cuff permit?
7      A   It was either January 2018 when they gave me
8  the front cuff. I can use a double cuff, I just can't use
9  a single cuff.
10     Q   So the double cuff would be sufficient?
11     A   It's basically like a waist chain, yeah, the
12  chain around your waist with a padlock.
13     Q   You testified previously -- I'm sorry. Go
14  ahead.
15     A   I went to, like, the yard because their
16  putting a waist chain on us took more time, and they always
17  were always complaining about that, so a double cuff was
18  okay if I can go, like, short distance. I couldn't be like
19  that for, you know, 20 minutes or an hour.
20     Q   I think your testimony previously was that the
21  first time you received any kind of alternative cuffing
22  permit was in 2018; is that correct?
23     A   Yeah. That's when staff required some type of
24  medical permit for alternative cuffing. That's when the
25  doctor gave me front cuff. He said they couldn't do double

Page 115

1  cuff permits. That was a debate between him and the nurse
2  and the correction officer.
3      Q   Okay. But prior to that, did you have
4  alternative cuffing?
5      A   Yeah. They would just do it without any
6  medical permit because they could see my injury was clearly
7  obvious that I couldn't be handcuffed behind my back with a
8  single pair of handcuffs.
9      Q   Did you have alternative cuffing from the time
10  that you entered the Department of Corrections until --
11     A   Yeah.
12     Q   -- Strike that. Did you have alternative
13  cuffing without a permit from the time you entered the
14  Department of Corrections until 2018 when you first got the
15  permit?
16     A   Yes.
17     Q   So you've never been cuffed behind your back
18  with single handcuffs?
19     A   I have for short periods, like emergency with
20  a chain handcuff, which is longer than the link handcuff.
21  That's only from point A to point B real quick, but I can't
22  be like that for long periods of time.
23     Q   Do you know when you have been cuffed behind
24  your back with that type of handcuffs?
25     A   In the '90s, early '90s maybe or mid '90s,

Page 116

1  sometime at Tamms.
2      Q   And you were at Tamms before you transferred
3  to Lawrence in 2020; correct?
4      A   Yeah. I was in Tamms from '98 to 2012 when it
5  was closed.
6      Q   So since you first received your permit in
7  2018, at any point in time have you been cuffed behind your
8  back?
9      A   Never. Not with a single pair of handcuffs.
10  Double cuffs sometimes.
11     Q   When have you been double-cuffed during that
12  time?
13     A   Either to go to the shower or to the yard. If
14  they didn't -- If they came and they didn't have a waist
15  chain on them and they didn't want to go get one, then they
16  would double cuff me even though that was against policy.
17     Q   Do you know when that was? Do you know the
18  dates or approximate time period that was?
19     A   I don't know. It's on video. There's
20  recordings of all of that stuff, so I don't -- whenever I
21  was in Lawrence from 2018 to '20, so within those years.
22     Q   Okay. Between August of 2022 and your
23  transfer in January of 2023, were you ever cuffed behind
24  your back at any point in time?
25     A   No.



Aaron Fillmore                                                    March 26, 2024

Page 117

1  Q  With even a double cuff, you were never cuffed
2  behind your back?
3  A  No.  Either I was denied accommodation, or I
4  just stayed in my cell, or they waist chained me or front
5  cuffed me or no cuffs.
6  Q  Did you ever request to be double-cuffed
7  between August 2022 and your transfer in January of 2023?
8  A  Yeah.  They said I couldn't do it per policy.
9  Q  Who did you make that request of?
10  A  Lieutenant Piper, sergeants, CO Mandendorff.
11  Everybody that worked in AD.  They wouldn't do it because
12  they put up cameras and it was against policy, so they
13  wouldn't do that anymore.
14       MS. POWELL:  Now I think I'm done.  No further
15  questions.
16       MS. MATUSOFSKY:  I don't have anything
17  further.  Do you want to go over signature?
18       MS. POWELL:  I can.  Mr. Fillmore, are you
19  familiar with the signature process for a deposition?
20       THE WITNESS:  Reserve and all of that?
21       MS. POWELL:  Yeah, if you would like to
22  reserve or waive.
23       THE WITNESS:  I'll reserve.
24       MS. POWELL:  Okay.  We'll have to coordinate
25  that through the facility that you're with.  Just to be

Page 118

1  clear, they'll coordinate that to where you can review it.
2  You're not allowed to keep a copy of the deposition.
3  You'll have to order one if you want to do so.  However,
4  per local rules, if we use it for our dispositive motion, a
5  copy will be attached to the dispositive motion.  Okay?
6       THE WITNESS:  Okay.
7       MS. MATUSOFSKY:  I'll take a PDF full and
8  condensed with an index.
9       MS. POWELL:  I'll take the same.
10
11       (Deposition was adjourned at 1:28 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 119

1                CERTIFICATE OF REPORTER
2
3       I, Jamie Jo Kinder, CCR No. 842, CSR No.
4  084.003306, do hereby certify that the witness whose
5  testimony appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness was taken
7  by me to the best of my ability and thereafter reduced to
8  typewriting under my direction; that I am neither counsel
9  for, related to, nor employed by any of the parties to the
10  action in which this deposition was taken, and further that
11  I am not a relative or employee of any attorney or counsel
12  employed by the parties thereto, nor financially or
13  otherwise interested in the outcome of the action.
14
15
16               Certified Shorthand Reporter
17
18
19
20
21
22
23
24
25

Page 120

                              LEXITAS LEGAL
                         711 North Eleventh Street
                        St. Louis, Missouri  63101
Phone (800) 280-3376  *  stl.customerservice@lexitaslegal.com
April 4, 2024
Ms. Jennifer Powell
ASSISTANT ATTORNEY GENERAL'S OFFICE
201 West Pointe Drive, Suite 7
Belleville, IL  62226
In Re: AARON FILLMORE, #B63343 v. ROB JEFFREYS, et al.
Dear Ms. Powell:
Please find enclosed the copy of the videoconference
deposition of AARON FILLMORE taken on March 26th, 2024,
in the above-referenced case.  Also enclosed is the
original signature page and errata sheets.
Please have the witness read the copy of the transcript,
indicate any changes and/or corrections desired on the
errata sheets, and sign the signature page before a notary
public.
Please return the errata sheets and notarized signature
page to Lexitas for filing prior to trial date.
Thank you for your attention to this matter.
Sincerely,
Jamie Jo Kinder, CCR, CSR
Enclosures
Cc: Ms. Alison Matusofsky



Page 121

```
STATE OF          )

                  ) ss.

COUNTY OF         )

I, AARON FILLMORE, do hereby certify:

That I have read the foregoing deposition; That I have made

such changes in form and/or substance to the within

deposition as might be necessary to render the same true

and correct; That having made such changes thereon, I

hereby subscribe my name to the deposition.

    I declare under penalty of perjury that the foregoing is

true and correct.


                    _____


                         AARON FILLMORE

    Executed this _____ day of _____, 20___,

At _____ County,_____.


                    _____


                         Notary Public

My Commission Expires: _____
```

Page 122

```
              Witness Errata Sheet

Witness:  AARON FILLMORE

In Re: AARON FILLMORE, #B63343 v. ROB JEFFREYS, et al.

Date Taken:  March 26th, 2024

Upon reading the deposition and before subscribing thereto,

the deponent indicated the following changes should be

made:

Page____Line____Should read:_____

Reason assigned for change :_____

Page____Line____Should read:_____

Reason assigned for change :_____

Page____Line____Should read:_____

Reason assigned for change :_____

Page____Line____Should read:_____

Reason assigned for change :_____

Page____Line____Should read:_____

Reason assigned for change :_____

Page____Line____Should read:_____

Reason assigned for change :_____

Page____Line____Should read:_____

Reason assigned for change :_____

Witness Signature:
```



## $

**$40,000** 81:1

## 0

**000057** 31:21

**000097** 92:16

**000152** 59:24 68:2

**000153** 59:25

**0018** 61:23

**0020** 46:14

**0033** 46:14

**0052** 58:1

**0054** 58:2

**0061** 29:15 30:4

**0062** 29:15

**0073** 36:11

**0085** 63:3

**0102** 74:9

**0257** 54:15

**07-22-235** 112:13

## 1

**1/10/75** 7:21

**1/18/23** 98:13

**10** 40:3 44:4 54:20

**10/21/22** 71:23

**10/25** 95:1

**10/7/22** 70:6

**10:00** 5:1 51:10,15
56:17

**10:30** 51:18 56:24
57:8 108:20,22

**10th** 86:23

**11** 41:14 63:5

**11:05** 109:21

**11th** 33:6

**12** 75:9,10 111:5,
10

**12/23/2022** 73:21
74:10

**12:00** 109:22

**13** 34:14 45:6

**14** 13:14

**153** 68:2

**15th** 28:5,10

**17** 110:9

**18** 46:3

**1915** 23:25

**1982** 19:15 107:7

**1994** 10:16

**1997** 15:25 107:12

**1998** 34:20 105:19
106:11 107:6,9,
15,25 108:9

**1:05** 109:20

**1:28** 118:11

**1st** 27:24 28:9
30:22,24 39:1,20
42:10

## 2

**20** 18:5 114:19
116:21

**2009** 80:12

**2012** 116:4

**2013** 10:25 18:5

**2015** 10:22

**2018** 32:23 71:15
84:21 85:4 114:7,

**22** 115:14 116:7,
21

**2020** 10:25 44:4
104:24 116:3

**2021** 61:2

**2022** 11:1 14:7
20:5 24:7 26:14
27:25 28:6 29:1
30:24 31:9 33:6,
20 34:18 35:5
39:1,21 40:3
42:24 45:6 46:3
47:13 48:17,18,
21,25 49:15 50:19
53:1 54:1,20 56:5,
9,15,23 58:4,18
60:2,5 61:13,24
63:5,18 66:24
70:22,23 72:15
76:10 83:16,24
84:2,19 86:24
87:21 88:1,14
89:7 93:3,19
104:18 108:17
109:12 110:5,9,13
111:6,10,22
112:14 113:20
116:22 117:7

**2023** 11:11 14:7,
16 20:8 72:15
76:10 78:2 100:23
102:1,3 110:5
116:23 117:7

**2024** 41:8,14

**2033** 104:4,5

**20th** 26:14 35:5
56:9,14,15 60:2,5
63:18 67:25 83:16
89:6 93:3,19

**21** 47:16 48:16

**21st** 48:17 97:12

**22** 14:14,20 18:5
28:9,10 29:5

**38:13 46:25 52:23**

**22-2705** 59:24

**22nd** 49:15 50:19
56:16,23,25 97:13
108:17

**23** 14:15,22 18:5
47:1

**23rd** 11:10

**24** 12:16 39:24
100:23 102:1
105:15

**24th** 78:2

**25** 27:19 53:1
105:20 111:22

**25th** 29:1 52:22
54:1 55:1 87:20

**27** 112:14

**27th** 100:7

**28** 113:20

**28th** 33:19 112:17

**2nd** 48:21,25
58:17,18 102:3

## 3

**3/25** 31:21

**3/25/22** 30:7,16

**30** 20:16 108:19

**30-second** 57:7

**30th** 42:24 61:2

**31st** 58:4 88:1,14

**325** 62:24

**327** 110:25

## 4

**4** 107:12

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**4/22** 65:9

**4/28/22** 62:7

**4th** 48:18

---
**5**
---

**5/12/22** 62:7

**5/20/22** 35:18 36:12 62:6

**500** 65:19 75:8

**51** 30:23

**5th** 58:18

---
**6**
---

**6** 80:24 81:2,3

**6/1** 41:22 42:18

**6/10/22** 62:6

**6/11/2022** 47:18 62:8

**6/24/22** 62:5

**6/6/2022** 41:21

**63** 33:5,10

**65** 33:1

---
**7**
---

**7** 61:13,24 70:23

**7-22-178** 46:3

**7/18/2022** 47:18

**7/18/22** 46:22

**7/22/22** 51:10

**7/25/2022** 62:5

**7/25/22** 54:16 113:16

**7/31/22** 57:21

**77** 40:2

**7:35** 31:1

---
**8**
---

**8** 26:22 41:5

**8/11/22** 62:5,22

**8/2/2022** 47:19 62:8

**8/20/22** 62:4 63:23

**8/24/22** 62:8

**8/5/2022** 62:8

**82** 65:1

**87** 63:17

---
**9**
---

**9/2** 98:6,9,10

**90259** 10:11

**90s** 19:9 115:25

**91** 10:14

**92** 10:14

**98** 116:4

**99** 102:18

---
**A**
---

**A-R-T** 19:4

**a.m.** 5:1 51:10,15, 18 56:17 57:8

**AAG** 8:25 19:23 29:17

**Aaron** 5:4,10,17 8:6

**abbreviation** 37:10

**ability** 12:4 103:13

**accommodate** 26:20 72:6

**accommodation** 71:22 79:2 80:1 94:23 95:10 100:14 117:3

**accommodations** 88:6 103:17 112:3

**accurate** 20:19,23 32:8,21 36:24 83:21

**acetaminophen** 12:10,11 62:24 63:14

**Act** 83:4

**active** 31:9 81:15

**activities** 80:2 103:1

**AD** 40:18 41:21 51:24 108:21 117:11

**ADA** 59:2 60:12,13 64:1,13 88:4,6,9, 10,17 90:5 112:3

**add** 13:15

**additional** 48:9

**address** 87:11

**addressed** 61:10

**adjourned** 118:11

**adjust** 24:6

**administrative** 16:17 18:6,11 28:18,20 76:16 90:23 104:20 105:1,3,5,12,17, 22 111:9

**Advised** 74:17

**affect** 12:3

**AG's** 59:23

**age** 5:11

**aggravated** 10:18

**agree** 20:18,21 32:6,14,25 41:12 44:17,20 54:5 62:17 66:3 68:16, 18 69:4 80:7 106:17,23

**agreeable** 74:20

**AGREED** 5:2

**agreement** 70:2,4

**ahead** 29:7,18 36:23 39:17 40:16 64:11 66:12 111:18 114:14

**Alison** 5:23 31:19 83:10 101:21 106:2

**allegations** 21:2 81:25

**allowed** 70:18 71:4 72:2 76:6 105:13 118:2

**alternative** 84:23 90:10 107:21 114:21,24 115:4, 9,12

**amazed** 90:6

**amendment** 24:6, 9,15

**Americans** 83:3

**ancillary** 83:15

**annoyed** 57:13,16

**answering** 39:18

**answers** 7:8 8:9 13:4

**anymore** 93:10 117:13

**anytime** 33:25 34:1 98:18

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

**apologize** 97:7

**appearing** 6:22

**appointment** 35:10 38:2 60:5 68:10,13

**appreciated** 93:2

**approve** 77:1

**approved** 41:22 42:10,18

**approximate** 111:13 116:18

**April** 33:6,19 34:18 111:5

**ARB** 46:14,16,17 48:9 61:23 92:6,7

**arbitrarily** 21:14

**arbitrary** 105:24

**arising** 17:6

**Arizona** 8:18

**arm** 15:22 25:22 32:17,18 37:15,20 40:5 65:2,3,5 80:7 101:6,11 102:1

**arms** 26:7 64:15, 17 67:16

**arranged** 9:9

**arrived** 27:23 31:3

**arthritis** 80:12

**asleep** 45:5

**assaulting** 106:12

**assessed** 60:10, 11

**assessment** 65:16

**assignment** 99:18,23

**assume** 7:12 61:3 105:18,19

**assumed** 9:10 21:20

**attached** 85:5 118:5

**attacking** 106:25

**attend** 102:16

**attention** 40:11

**attorney** 21:8

**attorneys** 21:4,7

**August** 24:7 26:14 28:5,10 31:9 38:7, 9 47:13 48:18,21, 25 58:17,18 60:2, 5 61:13,24 63:5, 18 66:24 67:25 70:22 72:4 83:24 84:2 89:6 93:3,19 97:12 100:7 103:3 104:4 110:8,9,13 116:22 117:7

**Aurora** 8:2 19:2,5

**authority** 67:10

**aware** 18:10,13 23:13 24:4,19 35:22 36:1 55:21 66:8 76:1,13,14 108:24

---

**B**

**B63343** 9:24 47:16

**back** 11:1 32:9,13, 19 36:10 42:5,8 49:13,19 51:9 55:7 57:5,10,14 63:22 70:5 71:12, 25 77:15 81:20,21 82:12,13,20 83:13 87:12,17 93:13 95:6,15,20,21,24, 25 96:6,14,18 97:9,20 98:22

100:13,17 101:5 102:14 104:18 106:7,17,22 107:1 109:24 112:18,25 113:2,19 115:7, 17,24 116:8,24 117:2

**bad** 27:18

**Baldwin** 16:12 17:5

**ball** 101:6

**barring** 45:1

**based** 27:11 62:11 69:7,20 72:6 87:24 88:12,21 109:5,6

**basically** 26:6 90:2 105:11 114:11

**basis** 19:1

**Bates** 31:21 68:1 92:16 110:25

**beat** 16:3 107:11

**begin** 6:17

**beginning** 18:2,3 82:21 104:10

**behalf** 5:12

**bigger** 30:1

**bilateral** 74:15

**bill** 80:19

**bills** 80:14

**birth** 7:20

**bit** 6:23 29:25 54:11 58:6 59:18 65:4 68:1 106:5

**black** 73:17

**blame** 78:16

**blew** 52:2

**boat** 37:10

**bones** 34:4

**born** 7:22

**bottom** 29:13 30:3 41:12 49:14 58:7 112:7

**bounce** 82:18

**box** 44:25 73:17

**bracelets** 101:4

**braces** 23:2 73:23 74:17,24 75:23 76:1,5

**brain** 36:2

**break** 7:15,17 12:22 13:3 30:13 49:7,11 72:17 73:3 78:24 82:8,9 94:22 109:16 110:1

**briefly** 82:20 100:21

**bring** 59:18 77:13 78:25

**broken** 107:7

**brought** 21:2 29:17 81:25 108:14

**building** 51:24 108:21

**bulletin** 92:14

**bulletins** 91:21

---

**C**

**cages** 50:21 105:11

**call** 25:9,11 39:11, 12 42:1 43:3,8,19 44:24 62:4,6 73:22 75:4

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**called** 11:4 15:25
16:12 25:8 40:19
41:22,25 42:6
87:4

**cameras** 117:12

**cancel** 38:8,14

**canceled** 62:7

**candidate** 60:12

**cap** 19:4 65:10

**capillary** 65:10

**care** 24:12 53:20
80:17,21

**carpal** 12:8 23:3
73:21 74:15 75:23
76:1 101:7 102:7

**case** 5:25 15:24
16:2,5,8,15,21,24
17:1 20:24 21:3,
11 22:6,20 26:4,
18 34:9 77:20
81:15 83:10
107:13 108:15

**caseload** 79:21

**cases** 15:18
17:15,21

**categories** 102:24

**caused** 96:17,18

**CCR** 5:5

**cell** 28:9,19,22
29:17 30:6 39:24
44:22 45:2 46:1
79:3 96:5,12
99:10 102:10
105:10 117:4

**cells** 95:6

**Center** 10:24 11:1,
2 13:21 14:6
17:24 24:25 25:21
27:24 76:10 91:11

**cents** 14:4

**cetera** 69:2

**chain** 20:22 28:2,8
31:7 37:18 38:5,6
54:22 58:23 59:1
63:24 64:13 65:7
68:24 69:1 70:11,
12,18,20,24 71:5,
14,19,24 73:23
75:1,23 76:20,21
77:11 83:21 84:1,
6,9 85:8,12,16
86:9,13,17,21
87:22 88:3 90:11
93:5,10,25 94:6
98:7,9,10,15,16,
19,21 99:12
107:1,2,16,22
114:5,11,12,16
115:20 116:15

**chained** 99:8
117:4

**chaining** 26:12

**chains** 67:4 69:6
71:9 73:13 77:6,7,
14,16 85:17 90:3
95:3 106:19

**Chaloupek** 30:11
73:1

**chance** 68:2

**changed** 71:16
81:5 84:22

**channels** 112:20

**charge** 18:20

**charges** 10:17,19

**chart** 20:15 31:8
40:3,4 54:10,20
56:4,7 58:22 62:3,
18,19 63:2 87:24
88:12,19 109:5

**check** 49:10 72:17

**child** 8:9 98:24

**chronic** 37:16
65:9

**chronological**
10:23

**chronologically**
49:4

**circled** 63:14
112:3 113:3

**circumstances**
9:25 10:2

**civil** 17:10

**claim** 24:5,9,14,20
80:24,25 93:18

**claiming** 79:6,9,23

**claims** 24:4 27:1
83:2 108:14

**clarification** 112:1

**clarify** 14:19 21:7
38:12 45:14 91:5
106:20 107:6

**Clayton** 13:21

**clean** 13:24,25
99:24

**clear** 29:8 32:22
52:10 71:11 118:1

**closed** 17:17,18
82:24 116:5

**Coleman** 17:2

**column** 98:4,25
99:2,5 100:1

**command** 97:3,8

**commenced** 5:1

**commissary**
105:13

**communicated**
62:14 66:15

**communications**

21:6

**compensatory**
17:1 80:25

**complain** 85:22,24

**complained** 51:19
59:10 63:7 85:14,
20 87:6,9

**complaining** 33:7
40:11 44:1 67:1
85:23 88:11 108:4
114:17

**complaint** 22:5,11
28:17 34:8,11,14
65:5 67:22 79:11,
25 81:9 85:5
106:6

**complaints** 40:17
53:22 55:15 65:23
86:2 108:7 109:9

**completed** 62:7
96:23

**compound** 19:18
102:7

**computer** 29:24
46:10

**concern** 86:5,6

**concerns** 86:2

**condensed** 118:8

**condition** 107:4,
14,18,24

**conditions** 11:24
105:8

**conduct** 111:24
112:2

**conferencing** 7:3

**confinement**
105:8

**confirm** 90:17

**confusing** 38:23

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**consent** 23:21

**considered** 76:16

**constant** 32:11

**contact** 51:6

**contained** 23:7

**contents** 90:16

**continuation** 31:7

**continue** 84:1

**continued** 28:5 38:11 40:4 94:18

**continues** 37:1 47:17

**continuing** 38:9

**conversation** 49:18 50:4 57:7

**convicted** 11:16, 19,22

**coordinate** 117:24 118:1

**coordinator** 30:12 58:21 60:13 88:18

**copied** 54:13

**copies** 34:22 35:1 41:10 72:11,19

**copy** 31:21 43:15 53:1,7,11 54:13 72:12,18 73:2 92:22 101:17 118:2,5

**corner** 29:14 31:25 36:12 41:13

**correct** 8:10 13:6, 10 15:16 16:13 21:8 23:8 24:12, 17,18 25:6 26:23 31:10 33:4,8,12 38:6,15,16,19 39:2,5,7 45:8 46:4,23 47:4,10,

11,13,20,23 54:17,23 56:5,10, 18 57:23 60:18 62:13,25 66:5,22 68:11 69:12,14,18 70:3,10 73:10 77:4,12,21,22,24, 25 78:7 80:10 81:2,4,13 82:24 83:24 85:7 87:5, 18,23 88:4,15,19, 22 89:9,13 91:17 93:6,11,21 94:1, 13,20 95:4 97:24 98:2 101:14 102:5,13,17 106:13 107:7,15, 18 108:18 109:9 111:23 113:7,21, 22 114:22 116:3

**correction** 115:2

**correctional** 5:22 10:24,25 11:1 13:16,20 14:6 17:23 21:25 24:25 25:3,17,20 27:23, 24 76:10 91:11

**corrections** 9:21 10:13 61:17 84:19 90:23 91:10,16,25 92:18 103:24 113:24 115:10,14

**correctly** 32:20 33:3 37:3,21 40:23 41:6 47:22, 24 51:21 55:2 59:3 60:15 62:9 70:15 73:24 74:21 75:24

**counsel** 5:3

**counselor** 58:16 60:20,24

**counselor's** 60:8 62:1

**county** 13:15 15:15 17:15 82:22 104:8,9

**couple** 14:12 16:6 87:15 110:4

**court** 6:24 15:14 23:14 24:19 34:11 82:23

**court's** 23:22

**crime** 11:19 104:7

**crossed** 26:7 64:14,17

**CSR** 5:5

**cuff** 20:22 24:8,16 26:12 28:13,14 71:12,14,18,25 84:6,8,15 85:1,4, 7,8,11,13 95:5,23 96:5,6,13 97:9,20 99:11 100:12 101:13 107:1 113:25 114:2,4,6, 8,9,10,17,25 115:1 116:16 117:1

**cuffed** 28:19,21,22 32:13,19 73:16,18 77:14 84:10 85:15,21 86:4 95:15,19,21,24 96:18 97:16 98:22 99:9 106:16,19, 21,25 107:19,21 115:17,23 116:7, 23 117:1,5

**cuffing** 15:19 23:1 69:6 70:19,24 71:5,14 72:3 76:21 81:11 84:23 90:3,11 100:17 101:5,11 106:6 107:2,14 114:21, 24 115:4,9,13

**cuffing/waist** 69:1

**cuffs** 64:13 84:9 86:2 97:22 98:3 99:7,11 116:10 117:5

**Cunningham** 47:19 48:21 54:7 58:22 59:9,11,18 60:13 62:2,15,19 88:2,18 89:1

**current** 8:11 10:15 31:8 83:23 104:3

**custody** 9:20 16:12 36:17,18 74:13 78:3 81:12 85:21 89:4 90:4 103:23 106:18,24 113:23

**cut** 18:2 101:8

**D**

**D/t** 36:17

**damages** 79:10 80:25

**date** 7:19 30:19 48:17 54:16 58:5, 7 95:5 99:5 108:22 110:17 112:15

**date-stamped** 41:19

**dated** 60:1 74:10 102:1,2

**dates** 48:21 55:16 98:1 100:1 103:1 110:8 116:18

**Davis** 16:12 17:5, 20

**day** 11:15 14:2 33:24 39:24 55:6 65:19 67:13 68:10

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179

LEXITAS

Case 3:22-cv-02705-GCS    Document 125-1    Filed 09/20/24    Page 37 of 51    Page
ID #1597
Aaron Fillmore                                    March 26, 2024   Index: days..documents

75:8,10 97:18,24
98:14 99:3,16
100:23 103:25
105:15 112:25
113:18

**days** 40:20 87:4
96:21,22 97:15,
20,21 98:18,21,22

**dealing** 18:21
20:21 21:13

**debate** 115:1

**December** 13:17
14:16,20 106:11
107:9 109:12

**decide** 78:25

**decided** 108:6

**decrease** 65:6

**decreased** 37:2

**deemed** 113:6

**deeming** 112:16

**defendant** 24:15
26:8 28:7 38:11
81:1

**defendants** 5:3,12
8:25 22:22 81:10

**defendants'** 13:4
22:14 41:5 80:24

**degenerative** 34:4
37:16 65:9

**Dekalb** 7:23,25
104:9

**deliberate** 26:5,19
53:20 69:20 112:5

**deliberately** 51:12
93:15

**deliver** 44:16

**delta** 37:16

**demand** 95:20

**denial** 53:19

**denied** 22:1,2
57:21 64:2 68:20
69:1,5 71:1,22,25
72:6,13,14 79:2
80:1 81:16 94:22,
25 95:10,22,25
96:8,20 97:18
98:5 100:4,12,18
102:18,19,22
103:16 117:3

**density** 34:15

**denying** 24:11
69:10 108:25
109:4

**Department** 9:21
10:13 84:19
90:19,22 91:9,15,
24 92:18 103:23
113:24 115:10,14

**depose** 9:11

**deposed** 8:24 9:11

**deposes** 5:12

**deposition** 5:1,4
6:1 9:5 12:22
117:19 118:2,11

**depositions** 6:6

**describe** 19:16
20:12 21:22 50:22

**designated** 47:9

**desk** 67:16

**detail** 10:21
106:10

**detention** 16:17
18:6,11 28:18,20
76:17 104:20
105:5,12,17,22
111:9

**determine** 88:8
103:16

**determined** 109:7

**diagnosed** 80:12

**diagnosis** 34:16
74:16

**diclofenac** 75:10

**dictated** 26:8
87:17

**difference** 84:6,12
105:12

**difficult** 6:23 97:6

**direct** 97:3,8

**directed** 91:2

**directing** 45:12

**directive** 90:23
91:3,10

**directly** 33:3

**director** 74:18
104:19

**Disabilities** 83:4

**disability** 26:10
32:21 63:25 64:13
71:11 79:3 90:5
96:17 103:17
107:5 112:3

**disabled** 21:24

**discharge** 10:18

**disciplinary**
18:17,19 97:2,5,8
105:2 106:10,11

**disciplined** 99:14

**discomfort** 63:25

**discovery** 22:14
23:13 46:8 64:9
89:21

**discretionary**
105:24

**discuss** 53:17
67:18

**discussed** 17:11
36:19 65:17,21
74:14 79:24 80:5,
8 82:2 106:9
108:16

**discussing** 36:20
65:13 74:23

**dishonesty** 11:20

**dismissed** 24:19

**disobeying** 97:3,8

**dispositive** 118:4,
5

**distance** 114:18

**distinction** 85:10

**distress** 79:9

**District** 17:4

**DOC** 29:12

**docket** 15:14
29:11

**doctor** 20:14 25:2
63:12 80:19
114:25

**document** 23:23
27:11 29:20 34:10
41:4 46:14 47:16
50:13 52:22 54:9,
14 55:4 59:22,24
74:9 90:17,20,24
91:6,7,11 92:3,15,
16 110:20

**documentation**
41:20 62:3,18
101:23

**documented** 31:6
32:15,22 55:15
76:18 85:18
96:19,23 97:21

**documents** 9:16
22:19 27:15 28:17
30:5 41:5 46:17
48:9 49:3 74:14



91:19,20 110:7

**dog** 105:11

**door** 45:4 97:16, 22 99:8

**double** 113:25 114:2,6,8,10,17, 25 116:10,16 117:1

**double-cuffed** 116:11 117:6

**downstairs** 73:17 95:8 99:8

**due** 16:17,19 28:17 36:17 65:23 69:11

**duties** 14:25

___

**E**

___

**e-mail** 72:21 73:1

**earlier** 31:16 54:6 68:1 71:8 78:2 110:3,6

**early** 19:9 110:8 115:25

**easier** 46:12 54:11

**economic** 79:6

**educated** 74:16

**education** 103:8, 12

**eighth** 24:6,15

**emergency** 25:12, 15,21 26:1 46:3 47:6,10 58:13 112:8,10,16 115:19

**EMG** 35:21 36:6 37:19,23 58:23 60:11 65:8,17 67:18 73:9,21

74:1

**EMGS** 35:22 36:1

**emotional** 79:9

**end** 16:20 52:18 69:3 101:8

**enjoining** 81:10

**entail** 13:23

**entered** 115:10,13

**entire** 17:25 18:4 67:17 86:6 97:14

**erythro** 12:10

**escorted** 51:25

**essentially** 43:12

**et al** 59:24

**evaluate** 37:19 58:23

**evaluated** 57:1 60:13 79:16 88:7

**evaluation** 56:10 109:7

**evaluation/ discussion** 74:20

**event** 81:20

**events** 12:4

**exact** 18:20 110:17

**examination** 5:13 56:18,22 67:12 82:10 106:3 111:19

**examine** 56:22

**examined** 5:11 26:6 55:21,23 56:3,4 59:2 77:10 88:4,5,8,13,24

**examining** 87:25

**Excessive** 16:3

**exchange** 95:16, 17

**excuse** 29:1 58:17 75:7

**exhibit** 85:5

**existing** 28:2 108:10

**expire** 70:21

**expired** 70:12,20 71:19,24 84:2 88:10,15 94:9,13

**explain** 24:24 26:3,17 33:22 34:1 37:23

**explained** 35:15 66:10,13 74:1

**expressly** 5:8

**expunged** 18:18

**extra** 8:23

**eye** 51:6

___

**F**

___

**F-I-L-L-M-O-R-E** 5:19

**facilities** 10:21 104:15

**facility** 5:22 13:16 21:25 52:25 76:9 103:24 113:24 117:25

**fact** 99:6

**facts** 17:7

**failed** 19:25

**failing** 24:6,8,16 26:5,20

**failure** 97:3,6

**fair** 6:20

**fall** 45:5

**fall/winter** 14:14

**familiar** 68:7 117:19

**February** 20:8 102:3 107:12

**federal** 82:23

**feel** 81:24

**fell** 19:17

**felony** 11:16

**Fifty** 14:4

**figure** 61:21

**file** 17:19 58:13 109:6

**filed** 15:12,15,25 16:11 22:5 24:11 34:9,11 42:21 55:21 58:3,10 82:22,23 83:2 88:2 109:1

**filing** 21:1

**fill** 25:8

**Fillmore** 5:4,10,17 8:6,15 15:25 29:14 30:4 31:20 36:11 46:14 47:16 54:15 58:1 59:23 61:23 63:3 74:9 82:13 111:21 117:18

**find** 52:24 92:9

**finding** 34:17

**fine** 27:13 29:18 49:8 53:14 56:13

**fingers** 33:8 35:13 63:8

**finish** 6:17,18 7:1

**firearm** 10:18

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**firms** 21:4,6

**five-minute**
109:16

**flu** 79:5 95:1,11

**FNP** 54:22

**folded** 67:17

**follow** 42:22

**follow-up** 36:18
74:13 82:6 106:2

**food** 12:25

**force** 16:3

**forget** 53:13

**form** 43:4 48:2,4,
16 60:25 110:16

**formally** 79:16

**format** 6:13 91:22

**forms** 43:19

**forwarded** 101:22

**found** 106:12
108:11

**fracture** 19:18
102:7

**frame** 14:10
111:13

**fraud** 11:20

**free** 23:20

**frequently** 99:1,2

**fresh** 68:13

**front** 20:22 23:1
26:12 28:13,14
42:3 46:20 63:21
64:12,16 69:1,6
70:19,24 71:5,14,
18 73:16,17,18
84:6,8,9 85:1,4,6,
8,11,13,15,21
86:2,4 90:3,11
94:23 99:9,11

101:4,11,13
106:19 107:1,21
110:24 114:4,8,25
117:4

**full** 5:15 58:10
118:7

**furlough** 74:13

---

**G**

**gang** 18:23

**gave** 33:12 100:19
109:3 114:7,25

**general** 105:13

**generalized** 93:17

**generally** 6:9 16:2
17:14 20:18 26:3,
17 27:5 28:24
35:1,10 78:25

**give** 23:21 68:2
95:7

**good** 6:16 30:3
38:7 49:6 53:5
65:9,10 83:24

**Google** 37:9

**Gotcha** 17:10

**GR** 58:1

**great** 7:7 27:12

**grew** 8:1,2

**grievance** 25:14
42:16 46:3,6,18,
22,24,25 47:6,12,
13 48:6,7,11,13,
16 52:23,24 53:1,
2,17,18 54:1,5,11,
12,24 55:1,4,5
57:4,5,13,14,18,
20,21,25 58:3,10,
13,14 59:10,21
60:1,4,18 61:2,13,
18,19,24 62:13,16

67:25 68:3,8,9,14,
16,18,22 69:4,10,
13 75:18 88:1,15
108:16,22 111:21,
22 112:4,12,13,
20,21,23 113:5,16

**grievances** 24:11
25:4,5 26:1,2
42:14,17,19 52:8
53:5 55:19,21
56:1,22 59:8,9,12
61:4,8 65:23
88:11 108:24
109:1

**group** 18:21,22

**groups** 103:8

**growth** 19:19 65:2

**Guadalupe** 13:15

**guess** 35:7 49:1
81:15 84:16

**guessed** 8:22

**guilty** 10:19
106:12 108:12

**guy** 86:3

**guys** 9:5 51:6
85:14

---

**H**

**hand** 33:8 63:8
101:6 108:5

**hand/arm** 65:4

**handcuff** 115:20

**handcuffed** 86:18
105:9 115:7

**handcuffs** 86:20
115:8,18,24 116:9

**hands** 86:19

**hands-on** 88:25
89:4

**handwritten** 54:19

**happen** 59:13

**happened** 78:17
96:25 107:11

**happening** 39:25

**hard** 58:6 110:21,
23 111:2

**hardship** 16:18

**HCU** 47:17 62:2

**HCUA** 47:19 48:21
54:6 61:8 62:19
88:2

**HCUA/ADA** 58:21

**head** 7:9 20:10
32:10

**health** 79:13,19,20

**healthcare** 43:17
45:13,15

**Healthcare/np**
45:7

**healthcare/nurse**
45:10

**hear** 6:23,24 7:2
85:22

**heard** 93:8

**hearing** 30:9

**helped** 65:6,14,15
66:4

**helpful** 73:5

**helping** 63:9

**HIPAA** 70:14

**history** 13:5
19:10,14 37:9
104:11 106:10,18,
25

**hold** 80:25 81:8
111:9

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**homemade** 106:13

**hope** 39:22 43:23 44:15 45:25 54:2 61:9,15

**hospital** 73:18 80:19

**hour** 14:4 49:6 109:24 114:19

**hours** 11:5 12:16 39:24 82:8 105:15 109:24

**housed** 103:21 104:19,21

**housing** 16:18

**huh-uh** 7:9

**hundred** 102:19, 22 104:22

---

**I**

**ibuprofen** 33:12, 17

**idea** 10:3,4,6 15:5 29:3 39:3 44:20 61:3 62:14 76:12 78:15

**identify** 89:23

**IDOC** 9:23 10:21 16:18 17:19 18:25 19:22 26:11 52:25 64:19,21,23 67:5 68:1 76:6 78:2 81:12,20 84:4,22 89:12,18 90:25 91:20 92:13 104:19

**ignoring** 51:12

**III** 24:5,14

**ill** 86:3

**Illinois** 7:23 8:3 9:21 10:12 11:17 15:15 16:17 17:9 19:2 43:9 62:4 66:16,21 78:17 81:13,21 84:5,19 90:19,22 91:9,15, 24 92:18 103:23, 24 113:24

**imagine** 28:23

**incarcerated** 6:7 10:12 18:25 104:8

**incarceration** 13:6 104:11

**incident** 17:7 71:7

**include** 76:2

**included** 8:8 26:23 27:2 48:21 50:10 54:10

**includes** 77:6

**including** 48:9

**Independent** 84:14

**index** 118:8

**indifference** 26:5, 19 53:20 69:20 111:25 112:5

**indifferent** 93:15

**individual** 36:17, 18,19 37:13 58:22,25 60:9,10, 14 62:3 74:12 88:3 89:4 90:4

**individuals** 16:11, 19 59:8 68:25 69:5 85:20 106:18,24

**ineffective** 42:25 43:14 44:2 62:23 64:2 65:23 67:2

**ineffectiveness** 65:24

**inflammation** 40:6

**information** 8:9,10

**informed** 50:25 64:1 68:23 69:24

**infraction** 18:17, 19

**injunction** 17:1 81:10,22

**injunctive** 81:14

**injuries** 19:11 32:9 34:4 79:23

**injury** 19:13,16 21:23 23:3 35:13 50:25 80:11 96:16,18 101:6, 12,14 102:1,2,6,7 107:10 108:10 115:6

**inmate** 9:23 10:7 25:3,5,10 39:10 43:3,7 44:24 45:12 81:13

**inmates** 21:10 91:3 104:20

**inside** 51:24

**instances** 72:2 96:19

**institutional** 39:9 44:8,14 45:18 91:10

**institutions** 84:5

**interaction** 50:22 51:14 52:3 96:11

**interactions** 55:14

**interest** 106:20

**interesting** 21:20

**interrogatories**

8:10 13:5,8

**Interrogatory** 80:24

**interrupt** 31:19 85:10

**interrupted** 86:15

**involved** 78:14

**involving** 11:20 15:19

**isolation** 16:16

**issue** 12:24 13:2 21:21 64:1 83:7 84:24 88:17

**issued** 47:18 62:8 74:18 85:3 97:2,5, 7 113:25

**issues** 21:13 61:22 87:11 100:20

**IV** 24:9

---

**J**

**James** 21:19

**Jamie** 5:5 49:10

**janitor** 99:23 111:7

**January** 11:10 14:17,22 20:8 26:21 41:8,14 72:5 78:2 84:21 85:4 97:13 100:23 102:1 103:3 110:5 111:4 114:7 116:23 117:7

**jargon** 37:6

**Jeffreys** 59:24

**Jen** 111:18

**Jennifer** 49:9 113:13

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**Jo** 5:5

**job** 6:16 7:7 13:5, 23 14:1,3 30:11 96:1 98:25 99:1,6, 15,18 110:10,13

**jobs** 15:8

**John** 19:2

**July** 44:4 45:6 46:3 48:17 49:15 50:19 52:22 53:1 54:1 56:16,23,25 58:4 61:2 87:20 88:1,14 93:24 108:17 111:10,22 112:14,17 113:20

**jumping** 49:3

**June** 39:1,20 40:3 42:10,24 54:20 80:12 86:23

**juvenile** 10:14

---

### K

**kind** 14:24 20:15 21:20 27:4 62:18 76:9 103:12 114:21

**Kinder** 5:5 6:24

**kiosk** 72:13 79:5 95:12,19,22 96:13 97:19 98:5,6,13, 14,18 102:11

**knew** 32:24 51:7 65:22 71:10,17, 18,19 98:23,24 100:20

**knowledge** 13:7 22:10,17 77:24 84:7 86:1 96:20

---

### L

**L-U-K-I-N-G** 29:1

**lab/radiology** 87:21

**labeled** 46:14,25 59:23

**labeling** 68:1

**Laboratory** 54:16

**Lacart** 19:2,7

**lag** 7:3

**laptop** 29:23

**late** 111:14

**Latin** 37:8

**laughed** 51:1,12

**law** 21:4,6 72:13 95:12,18 96:12 97:19 98:5,13,14, 18 102:11

**lawful** 5:11

**Lawrence** 10:24 11:1 14:6,10 17:23 18:5 19:24 21:13,25 24:25 25:20 27:23 28:9 30:20 31:3 32:23 38:10 59:9 70:18 71:17 76:9 77:18 79:13 80:5,9 83:8 91:10 93:14 104:18,21,24 110:4 111:5 116:3,21

**lawsuit** 15:11,12 79:1

**lawsuits** 15:15 82:21,23 83:1,2

**LCC** 29:14 30:4 36:11 54:15 58:1 63:3 74:9

**leave** 105:10

**left** 15:22 19:13,18 25:22 28:9,19 29:16 31:13,25 32:17 33:1,7 34:15,20 35:12 37:15,20 62:23 63:8 65:2,10 78:2, 17 80:7 101:5,11 102:1,7 107:25 108:5,11

**left-hand** 36:12 77:5 90:13 91:25 92:20

**legs** 86:10

**letter** 23:6 39:13, 21 45:21,24 91:4

**letterhead** 64:21 89:12,18 90:25 91:15,19 92:8

**letters** 92:19

**level** 76:14

**library** 72:13 79:5 95:12,19,22 96:13 97:19 98:5,13,14, 18 102:11

**licensed** 60:14 62:4

**lieutenant** 40:18, 19 49:16,17 50:4 70:6 71:24 87:4, 16 117:10

**limited** 19:21 32:10

**lines** 57:6 64:14

**link** 115:20

**list** 72:4,7 94:21 111:9

**listed** 13:5 98:1 99:5,23 100:2 102:25 103:1

**leave** 110:8 113:6,21

**litigation** 17:19

**live** 8:17

**local** 118:4

**locked** 39:24 59:13

**long** 10:4 13:18 51:14 52:3 71:17 100:5 111:12 115:22

**long-term** 16:16 66:1,6

**longer** 78:6 93:25 94:7 104:19 109:5,7 115:20

**looked** 51:1,3,8,11 54:6 80:4 83:20 86:23 87:20 88:18 90:24 91:11

**lose** 59:19

**loss** 79:7

**losses** 79:6

**lost** 16:6

**lot** 8:19 17:18 37:9 49:3 56:1

**low** 43:5,10

**Luking** 28:25 31:2 32:4 70:13 73:21 75:20 76:19,22 77:17 109:12

**lunchtime** 13:1

---

### M

**M-A-N-D-E-N-D-O-R-F-F** 70:9

**M.D.** 74:19

**made** 109:9

**mail** 39:9 44:8,14,

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



16,18,22 45:3,19 55:17 92:19

**maintenance** 13:17

**majority** 90:16

**make** 8:22 13:25 29:8 41:10 51:6 59:14 61:20 72:19 85:11 109:17 117:9

**Man** 97:6

**mandated** 80:16 97:20

**mandating** 90:3

**Mandendorff** 70:7, 11 117:10

**manipulated** 32:12

**March** 11:1 27:24 28:9 29:1 30:22, 24

**marital** 8:8,12

**marked** 47:6 112:4,8,9,10,19

**married** 8:12

**matter** 26:10 59:10 63:25 64:13 77:16 88:18 90:4, 17

**Matusofsky** 5:14, 23 31:24 49:5,9, 12 82:5 101:24 104:11 106:4 109:15,20,23 110:2 111:1,4,17 113:8,12,15 117:16 118:7

**max** 68:25 76:16 90:4

**maximum** 69:5 76:10

**means** 65:12

**med** 12:21 42:24 43:1 66:18 74:13

**medical** 11:24 15:21 19:22,25 20:9,11,12,15,18, 21 21:24 22:23,25 23:10 24:8,11,16, 22,24 25:12,21 26:6,8,12,20 29:8, 10 36:11 37:6 39:2,19 40:3,11, 19 43:16 44:5 48:9 53:20 54:10 55:23 56:4,6 58:22 59:10 62:3, 17 63:2,25 67:9 68:24 69:1,6 71:16 73:9 74:18 75:19 78:6,14 80:14 81:17 83:14 84:12,22 85:19 86:7,23 87:6,7,10, 16 88:8,19,25 89:4 93:15 94:25 95:3 100:19 101:17 107:20 108:6 109:6 111:25 112:2,5 114:24 115:6

**medically** 59:2 76:7 87:22 88:4 93:10,24

**medication** 24:7 43:6,18 47:18 58:24 62:8 65:24 75:14,16

**medications** 11:25 12:3,7,15, 23 24:20 52:1 109:13

**medicine** 43:8

**medium** 76:11,15

**meds** 42:24 45:7 49:16 51:1,11,20 60:11

**Melissa** 5:24

**meloxicam** 43:11 62:23 64:2

**memo** 92:13

**memory** 20:11,15 27:15,18

**memos** 91:21

**Menard** 16:3 104:21 107:12

**mental** 79:12,19, 20

**mentally** 86:3

**mercy** 39:25 44:15

**merit** 23:22,25

**mess** 82:18

**metal** 76:2

**Mexico** 5:22 10:1, 2,7 11:3,6,13 14:18 20:3,6 22:24 23:1,5,10 66:11,13 72:5 78:3,6,9,11,18 81:12 100:8,22 101:3,14,18 103:22 105:20

**mid** 115:25

**mild** 74:15

**milligrams** 62:24 65:19 75:8

**mind** 68:13 103:16

**minimal** 37:14

**minimum** 76:11

**minor** 8:9

**minute** 42:20 50:3, 17 52:4 73:4

**minutes** 108:19 114:19

**missed** 78:20 96:21,22 100:15

**missing** 109:18

**Mobic** 12:10 40:5, 6,9 43:11 54:20 63:8 66:9,17,25 86:24 87:4 109:13

**moment** 92:21

**months** 13:19 14:9,12 40:7 65:19 71:21,22 75:9,10 79:4 84:24 94:6,8,14 100:5 102:10 108:8 110:4

**moot** 81:16

**mop** 99:24,25

**mopping** 14:25

**morning** 51:23

**motion** 37:2 118:4,5

**motions** 22:21

**motor** 65:10

**move** 92:25

**movement** 19:21 32:10 37:14 96:21

**Moving** 98:25 99:1 100:1

**multiple** 19:20 32:16 34:19 110:23

**Murder** 10:18

**Myers** 5:24 9:5 24:14,15,20 26:4 27:2 28:7 38:11 59:11 60:5,9,17, 22 63:18,24 64:7 67:3,12,18 68:10,



19,23 69:15 73:22 75:1,3 76:20 77:1 78:7,11,16 82:1 89:7 93:3,14

**Myers'** 75:22

## N

**N-A-O-M-I** 8:21

**names** 8:5 21:12, 15

**Naomi** 8:14,19

**natural** 7:9

**nature** 93:18

**necessarily** 34:25

**needed** 65:19 73:4 75:9 88:9 107:20

**needles** 32:18

**nerves** 36:3

**neurology** 36:2

**nickname** 21:21

**nicknames** 21:16

**non-emergency** 58:14,15

**nonemergency** 112:19 113:1,3,6

**nonrenewal** 93:5

**normal** 112:20

**Northeast** 5:22 13:20

**Northern** 17:3

**notary** 5:6

**note** 30:18,22 31:11,21 32:6,7, 15 36:14,15,16 37:13 40:4 43:22 44:3 54:19 56:9 62:5,6 65:1 73:8, 20 74:3,7,10,12

87:21 98:5

**noted** 33:11 87:14

**notes** 31:17 32:23 33:16 35:8,9,17 39:3 49:23,25 50:6,7,11 52:7 56:11 70:25 72:8 82:17 109:17

**notice** 9:3,4,8 54:4

**notices** 9:7,10

**noticing** 37:2

**notification** 101:9

**Notoriously** 82:17

**November** 13:17 14:16,20 110:5

**NP** 30:18 31:12 35:19 36:14,15 41:22 45:13 49:16 50:2 51:10,18 52:23 62:5,6,24 63:12 64:2 70:13 73:21 74:12 75:20 83:16 87:17 111:23

**NRC** 11:7,8,9

**nuisance** 51:19 57:17

**numb** 65:5

**number** 9:23 10:8 13:13 29:11,12 33:1 47:3 59:24 74:5,6

**numbing** 33:17 35:13 62:23

**numbness** 33:7 37:2,19 63:8 108:5

**nurse** 5:24 20:14 24:5,9 25:1,2 26:18 27:1 28:25 30:18 31:2 32:3

33:6,11,12,15,16 35:4,11 36:14 38:13 40:3,8 41:25 42:9 43:21 44:5,17 45:15 48:2,11 49:18 50:18,24 52:5,12 53:25 55:9,18 57:2 59:6 61:1 62:4,6,12,22 68:17,19 69:11 70:1 76:18,21 77:8,12,14,15,17 78:7,10,16 82:1 108:16 109:11 112:6 115:1

**nurses** 20:14 44:23 66:20 77:7

## O

**oath** 6:11 82:13

**objective** 37:12

**objects** 23:2

**obvious** 32:22 37:15,18 38:5 58:22 71:11 115:7

**occasion** 65:5

**occasions** 102:16

**occur** 104:8

**October** 70:23

**offender's** 48:16

**offered** 95:11,12, 13 97:23 98:21 100:10 103:19

**offhand** 52:8

**office** 30:12 31:22 41:17 59:23 69:8 112:13

**officer** 25:3 47:12 84:15 86:4 95:17 98:23 106:12

108:12 112:22,24 115:2

**officers** 16:4 28:8 71:10,18 85:22 106:19,25

**official** 25:18 39:19 61:18

**officials** 16:18 40:1 44:16 54:3 61:5 66:13

**older** 34:22

**on-call** 74:19

**open** 16:21 97:16

**opened** 72:16 97:22 99:7

**optometry** 62:5

**order** 10:23 23:14, 23 49:2,4 59:19 82:19 118:3

**ordered** 31:13,25

**organize** 82:16

**original** 48:4

**originally** 113:18

**ortho** 36:9 41:23 42:10,18

**orthopedic** 35:19 36:5

**orthopedics** 35:23

**ossific** 34:15

**outcome** 16:5

**outdate** 104:3

**outlined** 69:9

**override** 67:10

**oversight** 55:10

## P

**p.m.** 31:1 118:11

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



Case 3:22-cv-02705-GCS    Document 125-1    Filed 09/20/24    Page 44 of 51    Page
ID #1601
Aaron Fillmore    March 26, 2024    Index: padlock..practitioner

**padlock** 86:14,18
114:12

**pages** 29:15
110:23 111:3

**pain** 24:7,20 32:11
35:13 40:4 49:16
51:1,11,19,20
58:24 60:11 62:23
63:25 65:5,6 66:1
86:24 96:17
106:21 108:5
109:13

**painter** 13:16

**pair** 84:8 115:8
116:9

**paper** 31:21 92:20

**paperwork** 64:16
92:10

**paragraph** 34:14

**paragraphs** 89:18
90:2,12 91:1

**parenthesis** 70:14

**parole** 104:1

**part** 14:17 17:3
89:24

**pass** 66:23 91:21
99:24

**passing** 14:24

**past** 20:16 50:20
51:16 56:16 65:6,
14 66:5

**patient** 33:2 65:7
74:16,20

**Paul** 5:17

**payment** 16:7,23,
25 80:15

**PDF** 118:7

**pending** 7:16
17:13,16,21

**Pennies** 15:7

**penological**
106:7,16,20

**people** 8:23 80:18
90:4

**percent** 102:18,
19,22

**Percy** 5:24

**perform** 67:12

**performed** 40:4
54:21

**period** 94:17
100:2 102:15
103:3 116:18

**periods** 115:19,22

**perjury** 11:22

**permanent** 81:10

**permit** 24:8,11,16
26:6,20 28:2 31:7,
8 32:16 33:2
37:18 38:6,14,18
44:5 45:8 52:1
53:21 54:22 57:21
58:23 59:1 60:12
64:1,3,13 68:20,
24 69:1,11,17,25
70:11,13,20,21
71:13,17,19,24
76:21 77:3,16
83:21,23 84:2,6,7
85:2,7,12 87:23
88:3,10,15 93:5,
10,25 94:6,13,18,
19 101:4,11,13
102:2 107:21
108:6 109:1,4
113:25 114:2,6,
22,24 115:6,13,15
116:6

**permits** 15:19
20:22 21:14 22:3,
25 23:1,5,7 26:12

**Pennies** 15:7

48:10 63:25 69:6
84:20,22 85:19
86:7 88:9 100:21,
22,24,25 101:2,17
102:4 107:2 115:1

**Persistently** 75:22

**person** 30:9 66:20

**personal** 105:14

**personally** 26:15
59:12 61:16 75:2,
6 89:15

**phone** 14:25 29:22
42:6

**phones** 99:24

**physical** 23:2
67:12 72:12
107:4,14,17,24

**physically** 77:10
88:13

**physician** 19:1

**pick** 44:18,23,24

**piece** 76:2

**pins** 19:19 32:18

**Piper** 40:19 49:16
50:4 70:7,12
71:24 87:4,16
117:10

**Piper's** 49:17

**placement** 110:16

**plaintiff** 5:3 24:10
34:14 81:11

**plaintiff's** 24:7,8,
16

**plan** 22:20 23:12,
16 75:7

**plans** 75:22

**plastic** 76:3

**plate** 19:19 65:2

**plead** 10:19

**pod** 99:19,21

**point** 9:12 17:24
19:11 35:2 84:20
94:5 103:2 115:21
116:7,24

**pointed** 26:9 67:6
69:8 89:8,16

**policies** 72:25

**policy** 26:9 63:24
64:8,19,20 67:4,5,
10 68:24,25 69:5,
7,11,15,17,20
70:1 89:8,16,20,
23 90:1,8 93:4,20
114:3 116:16
117:8,12

**Pontiac** 10:25
15:9 18:8 27:24
104:18,20,24

**population** 105:13

**porter** 13:20,22
14:6,9 15:1 96:1
99:19,21 110:4

**Powell** 6:14 31:19
72:18 78:24 82:7,
11 105:25 110:25
111:20 112:7
113:14,17 117:14,
18,21,24 118:9

**practically** 21:24

**practice** 68:17

**practitioner** 5:24
24:5,10 25:2
26:18 27:1 28:25
30:18 31:2 32:4
35:4,11 36:14
38:13 40:3,8
41:25 42:9 43:21
44:5,17 45:10,15
48:2,11 49:18
50:18 52:6,12

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


53:25 55:9,18
59:6 61:1 62:12
68:19 69:11 70:1
76:19,21 77:17
78:7,10,16 82:1
108:16 109:11
112:6

**practitioners**
20:14 77:8,12

**preferred** 72:12

**prepare** 22:5

**prepared** 22:13

**prescribed** 12:16
40:13 47:18 62:24
66:9 86:24

**prescribing** 40:9
43:25 65:20

**prescription** 40:6

**present** 10:22
19:15 42:1 49:17

**pretty** 90:11

**prevent** 11:25

**previous** 34:4
89:11

**previously** 82:14
95:2 101:20 102:9
105:4 114:13,20

**printed** 89:14
110:22,23

**prior** 30:21 65:23
71:15 83:1 84:19
93:9,12,23 107:22
108:7 115:3

**prison** 10:1 21:1
40:1 44:16 61:4
76:12 80:16

**prisoners** 21:4

**problem** 98:24
102:2

**procedure** 25:14

**proceed** 9:6

**process** 16:17,19
44:25 94:11
112:20 117:19

**processed** 113:1

**produce** 20:1

**produced** 5:11
19:24 29:9 31:22
46:9

**production** 26:22
41:5

**professional**
79:13

**program** 96:9
100:15 103:12

**programs** 80:2
102:13,16 103:1,9
105:10

**progress** 32:23

**property** 79:7

**Protocol** 107:16

**provide** 23:17
26:11 53:8 60:18
72:11 74:24 77:2
89:22 101:23

**provided** 22:22
23:4 24:12 48:24
49:15 54:12 60:23
72:7 89:3 90:4
94:22 100:14
101:20 102:12
113:7

**provider** 60:11,14
62:4 78:9 81:17
88:8

**providers** 83:14

**psychiatrist** 79:12

**public** 5:6

**pull** 13:10 23:23
27:6 29:7,18 34:8
40:24 42:21 46:7,
10 54:14 57:18,
19,25 59:18 74:5
83:9,11 113:8,12

**pulled** 83:11

**punch** 86:4

**purpose** 106:7,16,
24

**pursuant** 23:14
68:23

**put** 8:23 19:19
26:8 32:9 41:15
45:4 49:13 70:14
84:9 117:12

**putting** 114:16

**Q**

**qualified** 109:5,8

**qualify** 54:21 59:1
83:20 87:22 88:3,
12 93:10,16,25

**question** 6:17,19
7:5,11,12,16,17
13:13 38:23 70:22
77:23 84:17
100:16 103:15
104:2 107:23
110:3 113:19

**question/answer**
6:13

**questioning** 14:13
89:24

**questions** 5:14
6:14,15,16 9:12
12:1,5 27:6 78:23
79:18 82:6,11
83:15 106:1,4
108:15 111:20
117:15

**quick** 31:20 52:10
74:6 82:8 90:15
92:10 110:20
115:21

**quickly** 52:11
54:14 68:3 74:4
113:9

**quote** 74:15

**R**

**radiology** 54:16
55:9

**raised** 88:17

**range** 37:2

**RDC** 11:5

**read** 24:3 32:20
33:3 37:3,21 41:6
47:22,24 51:21
52:11 54:11 58:6
59:3 60:15 62:9
63:23 67:7 70:15
73:24 74:21 75:24
89:17,25

**reading** 33:3
36:21 39:4

**reads** 58:21

**ready** 52:15,17
68:4,5,7

**real** 21:12,15,19
31:20 90:15 92:9
110:19 115:21

**rear** 81:11

**reason** 37:18 38:5
58:23 69:10,25
93:14

**reasoning** 109:3

**reasons** 100:19
105:18,21

**recall** 12:4 14:11
17:3 20:9 21:11



27:12 29:4 32:3
33:14,18 35:10
36:20 38:1 40:8
45:2 64:6 65:13,
20 67:20 73:12
74:23 75:16 82:3
83:17 86:25

**receive** 16:7 64:10
65:22 72:15,21
75:19 88:25 91:18
92:19

**received** 16:23
22:24,25 30:24
39:1,20 40:10,15
41:14,20 44:13
45:24 48:17 50:12
52:25 55:4,16
57:4 58:17,24
59:22 75:17 80:14
91:18 93:13 94:14
108:24 112:13,18
113:19 114:21
116:6

**receives** 43:18

**receiving** 40:11,18
51:20 55:8,12
57:12 75:16 87:7

**recite** 72:10

**recollection** 15:18
25:20 27:14 50:17
90:1

**recommended**
35:19

**record** 5:16 29:8
33:10 41:3 46:13
58:1 82:12 83:20
86:23 87:20
110:17

**recordings** 116:20

**records** 19:22,25
20:2,11,19 22:19,
23 23:8,10 26:9
29:10 35:3 36:11

48:10 52:24 59:22
80:4 93:1 106:11

**refer** 74:19 75:3

**reference** 102:4

**referenced** 82:23
93:4,20 111:22

**referral** 36:6

**referred** 62:24
63:11

**referring** 13:13
36:6 46:19,22
56:21 63:4 76:19
89:24 91:14

**refiled** 81:23

**refill** 43:6 65:10

**refresh** 20:11,15
27:13,18

**refusal** 72:6

**refuse** 96:6

**refused** 64:1
100:12

**refusing** 97:9

**regional** 74:17

**regular** 19:1 26:2

**Rehabilitation**
83:4

**related** 6:6

**relevant** 22:20
26:25 81:25

**relief** 81:5,14

**religious** 103:5,7,
12

**remember** 10:22
11:9 14:10 15:4
18:20 19:8 27:13,
21 31:5 32:5
35:15 36:24 39:8
40:23 41:9 48:14
52:7,8 53:16 55:2,

24 64:24 85:18
91:2 94:7 104:12
109:14

**removed** 19:19,20
65:2

**renew** 24:8,16
26:5,20 38:14,18
54:22 69:17,25
94:9 108:6

**renewal** 42:24
43:1,4,19 44:6
45:7,8 52:1 53:21
57:21 75:1 94:11

**renewals** 43:8

**renewed** 31:10
54:20 68:25 70:13
94:18

**repeat** 7:2,4 98:17

**rephrase** 7:11
84:17

**report** 33:23 42:5
49:19 87:17

**reported** 32:15
34:5 87:12

**reporter** 5:6 6:24
112:1

**reporting** 99:14

**reports** 33:2

**represent** 5:24
37:5 41:16

**represented** 21:8

**request** 20:1,2,7
23:17,20 24:24
25:1,15,21,24
26:22 39:18 41:5
43:3,7 45:12 65:7
76:20 81:5,9,14
95:20 96:15 114:6
117:6,9

**requested** 16:25
19:24 23:10 64:9

76:23 89:21 95:18
96:12 114:2

**requesting** 31:7
74:16 75:23
81:21,22 107:17

**requests** 22:14
25:3,5,10,25 26:1
39:10 44:24 80:15

**require** 95:19

**required** 76:8
84:23 98:22
102:14 107:20
114:23

**reserve** 117:20,22,
23

**reserved** 5:8

**respond** 12:4 20:1
39:12 44:10 45:21
59:11,12,17 62:13

**responded** 47:12
58:18

**response** 7:3 14:5
22:21 26:22 41:4
42:15,16,17 47:15
48:1,6,16,20,24
53:4 54:6 58:16
59:6 60:8,9,13,18,
19,22,23 61:13
62:2,11,15 68:6
88:2,14,21 92:6,7
96:14

**responses** 22:13,
16 23:14 101:22

**restrained** 37:14
77:9

**resubmission**
113:5

**resubmit** 112:19,
23

**resubmitted**
113:20

888-893-3767
www.lexitaslegal.com
Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179


**results** 33:22
35:16 36:19 74:1

**retaliating** 24:10

**retaliation** 26:19
53:21,23 57:22
111:25 112:4

**returned** 103:23

**revealed** 74:15

**review** 15:14
23:22,25 40:4
48:17 52:11 54:20
62:2,7,17 68:3
87:24 109:5,6
118:1

**reviewed** 23:22
31:8 36:19 58:24,
25 61:7,8 74:14
88:19

**reviewing** 20:20
52:8 56:6 62:19

**reviews** 88:12

**revoked** 21:14

**right-hand** 29:13
41:13 65:18
90:13,14

**rights** 83:3

**risk** 106:17

**room** 30:10 57:2

**Rosa** 13:16

**rules** 6:9 118:4

**running** 43:5,10

**S**

**safe** 50:13

**Sangamon** 15:15
17:15 82:22

**Santa** 13:16

**sat** 26:7 67:16

**save** 73:5

**scanned** 110:7

**scheduled** 33:11
65:8,17

**screen** 9:15 46:11
49:14 90:15 92:11

**scroll** 41:3 46:21
48:10 52:9,15
58:9 63:17 68:4
74:7

**scrub** 13:24

**seconds** 51:16
52:4

**section** 23:25
37:13 65:16 75:7,
21

**security** 18:21,22
68:25 69:5 76:14
85:14,24 86:6
87:3,9,15 106:24

**sees** 61:18

**segregated** 79:3
102:10

**segregation** 16:16
17:24,25 18:4,6,
13,14,18 28:18,21
105:5

**send** 9:7,9 35:20
72:19 93:1

**sends** 9:8

**sentence** 10:15
33:1 69:3

**separate** 50:8

**sergeant** 40:18
41:22,24 87:3

**sergeants** 117:10

**serve** 106:7

**served** 13:9

**services** 80:2
103:5,7,12

**set** 70:21

**settle** 81:7

**shackled** 105:9

**shaking** 7:9

**Shaky** 21:17

**share** 9:15 41:2
62:22 90:15 92:1,
11

**sharing** 34:7
36:10 50:16 74:5

**sheet** 96:21 99:23
102:25

**short** 82:9 110:1
114:18 115:19

**shortening** 37:15

**shorter** 32:18 65:2

**shorthand** 5:5,6

**shortly** 40:20

**shot** 79:5 95:1,7,
12

**shoulder** 15:22
19:11 21:23 25:22
32:4,7,9,11,12
80:6,8 101:6,12,
14 102:2 107:10
108:1,11

**shoulders** 67:7

**show** 9:16 34:9
54:9 61:19 92:23

**showed** 64:8
73:21

**shower** 13:20,22,
24 73:17 79:4
95:13,22,23,25
96:22 97:13,19,
21,24 98:2 99:4
102:11 110:4

**116:13**

**showers** 72:14
105:14

**showing** 46:13
58:1 59:21 61:23
74:8,9 91:7 92:15

**shows** 15:14
37:15

**shrugged** 67:7

**sic** 11:5

**sick** 25:8,11
39:11,12 43:3,8,
19 44:23,24 62:4,
6

**side** 9:8 33:1
65:18 77:5 86:21
90:13,14 91:25

**sides** 84:10 86:19

**sign** 37:17 103:13

**signature** 5:7
89:18 112:15
117:17,19

**signatures** 91:1

**signed** 103:11

**significantly**
32:17

**signs** 92:18

**similar** 45:23
107:25

**simply** 98:5

**single** 26:13 114:9
115:8,18 116:9

**sit** 61:6 78:13

**sitting** 64:17 90:14

**situation** 84:15

**situations** 95:9

**six-month** 94:17
102:15



**skipping** 59:15

**sleeves/braces**
74:18

**slip** 25:9 39:12,21
43:5,10,12,15

**slips** 25:11 43:8
44:24

**small** 19:4

**solely** 114:5

**solitary** 15:10
16:19 27:18 46:1
71:22 105:9,15,20

**sort** 7:3

**sound** 6:19 29:2
31:3 35:6 111:11

**sounds** 81:2

**Southern** 17:8

**speak** 21:11 75:3

**special** 98:20

**specific** 86:1
107:4 108:9,14

**specifically** 39:18
69:13,16 83:15
87:16 93:19 96:11

**speculate** 62:20

**spell** 5:18 8:19,20
19:3

**spelling** 70:10

**spoke** 21:10 32:3

**spreadsheet**
110:22

**spring** 14:14 29:4

**stabbing** 106:13,
18 108:12

**stabilize** 76:3

**staff** 47:17 55:14
57:3 67:10 85:14
87:3,7,10,16 91:3

111:24 112:2
114:23

**stamp** 41:13

**standard** 79:18
86:20 91:15 92:18

**start** 6:19 27:14
75:9 97:7

**started** 7:19 108:4
110:11,13

**starting** 75:13
83:15 84:21

**starts** 33:2

**state** 5:15 11:17
30:6 42:23 45:6
68:18

**stated** 41:22 63:24

**statement** 94:12
98:17

**statements** 93:17

**States** 37:1

**Stateville** 11:5

**status** 8:8,12
28:18,21

**stay** 18:4 49:4
82:19

**stayed** 117:4

**step** 95:6

**STIPULATED** 5:2

**stop** 34:7 50:16
74:5

**stopped** 51:16

**streamline** 82:17

**stretched** 32:10

**strike** 47:5 53:24
57:11 58:12 68:17
97:4 99:1 105:7
115:12

**stuff** 85:25 90:6,8
116:20

**styloid** 34:15

**subject** 103:25
106:21

**submitted** 43:5
48:8 113:18

**sudden** 109:10

**suffers** 34:14

**sufficient** 114:10

**suggesting** 62:12

**suggests** 48:5

**suing** 26:4,18
77:20

**suits** 16:11 17:11

**summary** 54:16
55:9 62:18 64:6

**summer/fall**
111:14

**supplement** 23:13

**supplemental**
41:10

**supposed** 66:14,
15 97:17 99:2

**surgeon** 35:19
36:5

**surgeries** 19:20
32:17

**sweep** 13:24
99:24,25

**sweeping** 14:25

**sworn** 5:11

**syndrome** 12:8
73:22 74:15 76:2

---

**T**

**table** 64:18

**tablet** 75:8

**taking** 12:7,9 95:7

**talk** 15:11 17:12
21:5 42:4 48:13
50:3 53:17 55:19
59:16 72:18 75:1,
2,13 89:6 93:19

**talked** 17:14 20:24
21:1 38:2 40:20
41:21 42:7 49:15,
16,20 50:2 56:3
57:12 66:4 67:3,
21,25 70:12 80:1
82:21 87:15 90:5,
7 93:23 99:17
100:21 103:21
104:14 106:5
108:22

**talking** 7:1 9:16
20:25 30:9 31:16
40:17 42:3,20
56:21 83:17 87:3
94:10,11 96:10

**Tamms** 80:11,13
116:1,2,4

**taped** 89:19 90:12

**Taylor** 17:2

**terms** 105:6

**test** 37:24 67:18
73:10,13,21 74:1

**testified** 66:4 78:1
87:2 89:8 94:5
95:2 97:23 102:9,
12 105:4 110:3
114:13

**testify** 27:11

**testifying** 5:20

**testimony** 89:11
97:11 100:6
104:10 114:20

**Testing** 74:14



**therapy** 23:2
101:6

**thing** 18:7 46:15
50:9 71:23 99:22
105:6

**things** 42:22
90:12,18 93:18
95:11

**thinking** 109:23
110:21

**thirty** 52:4 59:12

**thought** 8:25
59:20

**threat** 18:21,22

**throwing** 53:5

**thumbs** 49:9

**ticket** 97:2,5,8

**tightened** 86:14,
18

**time** 6:7 7:15
14:10 17:25 18:18
19:7 20:6 21:8
28:1 31:10 35:5
37:14,19 38:4,19
49:11 52:5 54:21
55:20,22,24 56:5
64:17 66:24,25
67:17 70:17 71:4
73:6 76:15,22,23
77:11 83:19 84:5,
18,20 85:2,6,22,
25 92:1,11 93:4,7,
20 95:18,20
97:12,14 99:18
100:3 102:19,20,
23 103:2,6 105:14
106:1 108:11
109:21 111:13
113:23 114:16,21
115:9,13,22
116:7,12,18,24

**timeline** 26:23

27:2,5,8 31:15
35:18 38:25 39:5
40:24 41:21 42:23
44:4 46:19 49:13
50:8,18 51:9
52:10,19 55:7,8
56:8,24 57:19,20
62:21 63:22 70:5,
6 71:4 72:1 83:13
87:15 113:7,21

**times** 6:3,4 55:25
65:19 71:20 75:8
77:18 85:13 87:15
93:23 100:2
102:12,24 104:15

**tingling** 33:7

**today** 5:21 6:11,22
7:12 9:1 12:1,5,20
15:12 17:12 61:6
67:23 74:13 78:13
79:24 80:1 82:2
97:6 100:25
107:25 110:8

**told** 32:24 35:20,
24 36:7 41:24
42:8,9,11 43:13
49:20 51:7,10
65:15 68:19 73:1
82:16 93:9,12,24
94:3 96:4 103:22

**top** 20:10 30:16
31:25 34:10 41:3,
4 48:15 58:5
64:22 89:19 91:25
92:19

**tormenting** 96:17
106:21

**tortured** 16:4
107:12

**totally** 43:14 44:1

**touch** 67:15

**train** 59:19

**training** 24:22
84:12

**transcribed** 5:7

**transfer** 10:2 28:3
30:22 111:6,14
116:23 117:7

**transferred** 10:25
11:3,4,6 14:17
17:8 20:3 30:20,
21,23 72:5 100:8
104:17,23 111:11
116:2

**transfers** 105:1,2

**transpired** 26:16

**travel** 73:13

**treated** 47:17
51:19 57:16 60:14
62:3 79:18

**treatment** 15:21
20:10,12,19 21:25
22:2 24:25 25:13,
16,21 39:2 40:19
66:1,7 74:17
75:19 78:6,14
80:15 87:7,17
89:1,4 95:1
109:10 111:25
112:2

**tree** 19:17

**trial** 22:21

**trials** 16:6

**truthful** 22:11,16

**truthfully** 7:13
12:4

**tunnel** 12:8 23:3
73:22 74:15 75:23
76:2 101:7 102:7

**Tylenol** 12:13
63:15 65:6,14,17,
18,20,25 66:4,9,
17,25 75:8

**type** 59:10 75:19
114:23 115:24

**typed** 91:4

**types** 76:5

**typewriting** 5:7

**typical** 16:18

**typically** 9:7,9,10
76:2 84:13

---

**U**

**uh-huh** 7:9

**ulnar** 34:15

**unable** 110:9

**underneath** 73:20

**understand** 6:9,10
7:10 56:2 61:17
80:18 82:13

**understanding**
12:1 81:11 84:11,
25

**understood** 7:13
27:20 36:10 55:18

**unit** 51:24

**unmute** 49:11

**upset** 57:13

**utilize** 25:14

**utilized** 84:13

---

**V**

**varied** 105:18

**verbal** 7:8 25:25

**verbally** 25:1
44:11

**versus** 15:25
16:12 17:2,5
59:23 98:21

888-893-3767
www.lexitaslegal.com

Lexitas operates in all 50 states and is licensed where required Nevada Registration #116F.
California Firm Registration #179



**video** 6:22 7:3 116:19

**videoconference** 5:4

**violation** 24:6,9,15 70:14 83:3

**visit** 26:13 31:2 33:14 63:4,7,18 64:7 67:21 83:16 89:7 93:3

**visits** 20:13

---

**W**

**wages** 14:3 15:3 79:7

**waist** 20:22 26:11 28:2,8 31:7 37:18 38:5 54:21 58:23 59:1 63:24 64:13 65:7 67:4 68:24 69:6 70:11,12,18, 20,23 71:5,9,14, 19,24 73:13,23 75:1,23 76:20,21 77:7,11,13,15 83:21 84:1,6,9 85:8,12,15,17 86:9,10,11,13,17, 21 87:22 88:3 90:3,11 93:5,10, 25 94:6 95:3 98:7, 9,10,15,19,21 99:8,11 106:19 107:1,2,16,22 114:4,5,11,12,16 116:14 117:4

**waist-chained** 100:15

**wait** 6:25

**waiting** 23:8 33:17 89:22

**waive** 117:22

**walk** 90:14

**walked** 50:24 51:2,16 56:16

**Walker** 21:19

**walkie** 42:3

**walking** 50:20 51:11,17 79:14

**wall** 26:9 64:9 67:6 69:8,21 89:8,19 90:9,13

**wanted** 8:22 27:20 38:12 42:22 49:10 84:16 95:5,23

**warden** 47:9 112:8,16,19,25 113:20

**warden's** 92:14

**ways** 8:20

**weapon** 106:13

**week** 79:17 96:1,2 100:4

**weeks** 31:3

**weight** 77:6

**Wexford** 8:24 13:4 64:22,24 78:8 81:17

**whatsoever** 77:10 86:6

**whomever** 7:1

**wife** 8:17

**wife's** 8:13

**wing** 14:6 15:1

**Wise** 5:25 9:4 24:5,10,12 26:1,8, 18 27:1 35:4,11, 19 38:13 40:8,20 41:22 42:1,9 43:17,21 44:5,18 45:7,11,13,15

48:2,11 49:16,18 50:2,19 51:10,18 52:6,12,23 53:25 54:22 55:9,19 59:6,7,11 61:1 62:13,16 64:2 68:19 69:12 70:2 78:7,10,17 82:1 83:16 87:13,17 93:14 94:2 108:16 111:23 112:6 113:16

**woke** 37:1

**word** 18:23 37:6

**words** 97:6

**work** 43:11 61:17 97:15,19 98:25 99:1,2

**work/job** 72:14

**worked** 97:22 117:11

**worker** 99:16

**working** 42:25

**works** 25:18 61:21

**worry** 37:9

**worse** 108:2,3

**wrapping** 78:22

**wrist** 15:22 19:13, 18,21 23:2,3 31:14 32:1,17 33:8,17 34:20 35:12,13 39:2 51:1,20 62:23 65:9 67:15 73:23 74:17 75:23 76:1, 3 80:6 101:4,15 102:5,6,7 107:7 108:5,11

**wrist/arm** 108:1

**writ** 73:9,15

**write** 40:5 49:23, 25 53:12 63:20 68:17,21

**writing** 44:10 64:15 88:11

**written** 22:14 25:6, 25 54:3 58:20 60:20 61:4 62:2 67:22 68:21 79:11 88:23 90:6 91:24

**wrong** 113:2

**wrote** 22:7,8 31:12 35:25 36:7 39:1,8 44:4 45:7 46:3 50:18 51:18 52:20 53:3 55:3,5,12 56:1 57:21 60:1 68:9,14 69:23 72:3 75:18 113:16

---

**X**

**X-RAY** 32:1 33:11, 19,22 34:5,6,17, 18,21 35:15 36:18,19 37:15 60:11 62:7 65:9

**X-RAYS** 31:13 33:17 34:19,23

---

**Y**

**yard** 50:19 51:10, 25 56:17 69:2 71:1,7,25 72:2,6, 14 79:4 96:1,2,22 97:19 100:1,3,9, 10,12,18 102:11, 19,22 105:11 108:17,19 114:15 116:13

**year** 10:13 13:17 26:21 84:24 94:8 108:8



**years** 16:19,20
18:1 19:17 20:16
27:19 59:13 61:21
86:6,7 105:18,20
108:7 116:21

---

**Z**

---

**zoom** 47:2 60:10
61:21 65:4

